# TABLE OF CONTENTS

Table of Authorities…………………………………………………………  2

Memorandum of Law…………………………………………………………  3

    1.  Dismissal of the indictment is required based upon a manifestly corrupt violation of Hoey's attorney client and work product privileges; alternatively, a hearing must be held to determine whether the Government utilized privileged material against Hoey…………………………  3

Preliminary Statement…………………………………………………………  3

Factual Background…………………………………………………………  6

Argument…………………………………………………………  14

    2.  Evidence seized pursuant to an illegally obtained search warrant must be suppressed and a hearing order to determine whether this illegally obtained evidence led to the indictment in this case. …………………………  18

    3.  The Statute of Limitations has run on the 2009 charges…………….  20

Conclusion……………………………………………………………..  21

# TABLE OF AUTHORITIES

*In re Von Bulow,* 828 F. 2d 94 (2d Cir. 1987)…………………….          17

*Kastigar v. United States*, 406 U.S. 441 (1972) ……………………..          5, 17

*United States v. Coreas*, 419 F. 3d 151 (2d Cir. 2005)……….          20

*United States v. Falso,* 544 F. 3d 110 (2d Cir. 2008)…………          19

*United States v. Gartner,* 518 F. 2d 632 (2d Cir), *cert. den.* 423 U.S. 915 (1975)……………………………………………………………………          3, 17

*United States v. George,* 975 F.2d 72 (2d Cir. 1992)…………..          20

*United States v. Kovel*, 296 F. 2d 918 (2d Cir. 1961)………..          4, 13

*United States v. Leon*, 468 U.S. 897, 922-23 (1984)…………………..          20

*United States v. Nunez*, 2013 WL 4407069 (S.D.N.Y. Aug. 16, 2013…          15

*United States v. Rigas*, 281 F. Supp 2d 733, 738 (SDNY 2003)………          15,16

*United States v. Schwimmer*, 924 F. 2d 443, 446-47 (2d Cir.1991)…………          3, 17

*United States v. Schwimmer,* 738 F. Supp 654 (E.D.N.Y. 1990)………          5

*United States v. Weissman*, 1996 U.S. Dist. LEXIS 19067, *27 (S.D.N.Y. 1996)………………………………………………………………..          5

Rule 502(b) of the Federal Rules of Evidence………………………..          15

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**-------------------------------------------------------.**
**UNITED STATES OF AMERICA**

**v.**

**THOMAS HOEY,**                                              **15CR229(JMF)**

                          **Defendant.**

**-------------------------------------------------------.**

**MEMORANDUM OF LAW**

This Memorandum of Law is respectfully submitted in support of the

Defendant's pretrial motions.

1.  **Dismissal of the indictment is required based upon a manifestly corrupt
    violation of Hoey's attorney client and work product privileges;
    alternatively, a hearing must be held to determine whether the
    Government utilized privileged material against Hoey.**

<u>**Preliminary Statement**</u>

This case involves the deliberate and premeditated violation of Hoey's

attorney client and work product privileges by Government agents.  The invasion

was so egregious and "manifestly corrupt" that the indictment should be dismissed.

*United States v. Gartner,* 518 F. 2d 632, 633 (2d Cir), *cert. den*. 423 U.S. 915

(1975); *United States v. Schwimmer*, 924 F. 2d 443, 446-47 (2d Cir.1991).  The

violation occurred when Government agents went to the home of a private investigator working for Hoey's attorney pursuant to *United States v. Kovel*, 296 F. 2d 918 (2d Cir. 1962).   Two of the agents worked for the Drug Enforcement Administration ("DEA").   They were investigating the death of the sister of a former New York Assistant Special Agent in charge of DEA ("ASAC") whom at least one of the DEA agents knew well and with whom he was in contact with during the investigation.   By means of threats of arrest, false statements to the investigator to the effect that privilege did not apply, and insults, including asking the investigator whether she had a sexual relationship with Hoey, they induced the investigator to reveal to them her privileged communications with Hoey and, further, to provide them with her investigative file containing numerous privileged reports of interviews she and another investigator had conducted for Hoey's attorney.   The prosecutor and agents read the file and exploited its contents, along with Hoey's communications with the investigator.   After Hoey moved to disqualify the prosecutor and agents who had read the file, and to quash the grand jury subpoena given to the investigator, the Hon. Sidney H. Stein, sitting in Part One, held a hearing on the issues beginning on July 31, 2013.   At the hearing it was discovered that the former ASAC, the death of whose sister DEA was investigating, had been in contact with one of the agents who had interviewed the investigator and had been "pressing" the agent on the investigation.   After the

hearing, and while a decision on the motion was pending, the very prosecutor who was the subject of the motion to disqualify participated, without seeking the Court's permission, in grand jury proceedings which led to Hoey's indictment on a narcotics and obstruction charge on December 19, 2013.   Subsequently, on June 24, 2014, Judge Stein issued an opinion and order granting in part Hoey's motion and denying it in part.  Judge Stein's opinion is attached to this Memorandum as Exhibit One.[1]

Even if dismissal is not warranted for the deliberate violation of Hoey's privileges, an evidentiary hearing, similar to those required in immunity cases under *Kastigar v. United States*, 406 U.S. 441(1972),  is necessary to determine the extent to which the Government's exploitation of privileged communications and other materials tainted the instant indictment, and whether prosecutors and agents who became aware of the contents of the privileged communications and documents must be disqualified from participating in the prosecution of this case. See *United States v. Weissman*, 1996 U.S. Dist. LEXIS 19067, *27 (S.D.N.Y. 1996) (finding no "principled reason for distinguishing between [use immunity and privileged information] cases"); *United States v. Schwimmer,* 738 F. Supp 654, 658 (E.D.N.Y. 1990).   Indeed, the very DEA agent, Eric Baldus, who advised the investigator that she was not bound by the attorney client privilege and should

---

[1]   On November 9, 2015 Judge Stein ordered that all transcripts and papers relating to the Hearing be unsealed.

disclose her communications with Hoey and turn over her investigative file to him, has been attending court proceeding in this very case.  (See page 14, *infra.*)

## Factual Background

On January 9, 2009, Kimberly Kalo died at the Kitano Hotel in Manhattan. At the time of her death, she was in a hotel room with Hoey and Nicole Zobkiw. (Ex. 1 at 1-2). An investigation was conducted by the New York District Attorney's Office into her death and into whether Hoey had provided her with narcotics which led to her death.   No charges were filed as a result of this investigation.  (Ex. 2, ¶ 2).  Hoey was represented in this investigation by Murray Richman, Esq.   On January 13, 2009, Richman hired a private investigation firm called NGH to assist him.  This firm conducted interviews, prepared reports of those interviews, and furnished them to Richman.  (Ex. 1 at 1-2).  Kalo was the sister of a former ASAC of DEA.  (H. at 362-63)[2].   After the District Attorney decided not to file charges against Hoey, the DEA and the U.S. Attorney's Office began an investigation of Hoey in 2011. (Ex. 2, ¶2-3).  Richman then hired Deirdre Johnson, a former investigator with the Bronx District Attorney's Office, to assist him in connection with this new investigation and to conduct interviews with

---

[2]    "H" followed by a number refers to page numbers in the transcript of the Hearing conducted by Judge Stein.  The transcript has 407 pages and is to be filed with the Clerk of the Court in hard copy pursuant to Section 5.3 of the ECF Rules and Instructions.  The entire hearing transcript is relevant on the issue of the credibility, or lack thereof, of witnesses.

potential witnesses.  Johnson was provided by Richman with the reports prepared

by the prior investigator, NGH Group.  (Ex. 3 and Ex. 4). One of the people

Johnson interviewed was Alejandro Noriega who had been Hoey's driver the

evening of Kalo's death.  (Ex. 4). The report of the Noriega interview reflected that

Noriega had potentially exculpatory evidence on Hoey's behalf, that is, Noriega

had told Johnson that Kalo and Zobkiw were using narcotics before they met Hoey

in the hotel room on January 9, 2009.  Johnson's file also had numerous reports of

other interviews conducted by her and Richman's prior investigator.   (Ex. 4, Ex.5,

¶8).

        In connection with this investigation a grand jury subpoena was issued to

Zobkiw in early 2011.  Her appearance was scheduled for April 6, 2011.  On April

5, 2011, the evening before her testimony, Barry Balaban, Esq.,went to her home

to give her "advice" as her "lawyer".   Unknown to Balaban his conversation with

Zobkiw was recorded by Zobkiw's boyfriend.   The tape recording reflects an

attempt by Balaban to suborn Zobkiw's perjury about the events of January 9,

2009  with an attempt to exculpate Hoey from liability.  The tape recording also

reflects an attempt by Balaban to have Zobkiw speak with Johnson that night,

which Zobkiw rejected.   Balaban repeatedly stated on this tape recording that

Johnson was a private investigator working for Richman.   (H. at 254-258; Ex. 1 at

5).

The next day Zobkiw, accompanied by Balaban, appeared before the grand jury and committed perjury in accordance with the "advice" she received from Balaban.  Thereafter, Zobkiw was indicted for perjury on April 15, 2011. Following her indictment, she furnished the Government with the tape recording made of her conversation with Balaban on April 5, 2011.   This led to Balaban's indictment on January 29, 2013 and his subsequent guilty plea.  In February 2013, Zobkiw went to trial before the Hon. Kevin Castel on the indictment and was found guilty by a jury on February 6, 2103.  (Ex.2, at 2-7).

On February 11, 2013, two DEA Special Agents, Eric Baldus, his superior and Group Supervisor, Greg Finning, and Homeland Security Agent, Kristen Krauss, went to the home of Johnson, Richman's investigator.  The purpose of meeting was to interrogate Johnson and to force her cooperation.   The day before the meeting, Baldus sent an email to AUSA Garnett stating:   "do you think we can get a grand jury subpoena for her tomorrow?  Hopefully, I will not need it but will be helpful if she is uncooperative."  (H.270).

From the Balaban tape recording, which was then in their possession, and played at Zobkiw's trial, which had just ended, Garnett and the agents knew that Johnson had been working for Richman and that, consequently, Johnson might possess privileged information and documents.  (H.254, 256-58; Ex. 1 at 5).  The existence of privilege did not deter them from interrogating Johnson.  Richman of

course was kept in the dark and not told his investigator was to be interrogated. As Johnson was standing in Richman's shoes, this was the equivalent of going to Richman himself and interrogating him during an active investigation of his client.

During the interrogation of Johnson, which lasted hours (H.69), Johnson felt threaten.   She testified that she "felt that if [she]didn't cooperate to some extent, then certain matters that were presented to [her] were not going to be cleared up." She also testified that she was "on defense and trying to clear things up, because [she] felt like [she] and Richman were being accused of doing something that was not the case." (Ex. 1 at 7-8).  Her affidavit, which was admitted at the hearing, stated in part:

> During the course of my investigative work on the Hoey matter, I interviewed a number of individuals and obtained written statements.  I also reviewed written witness interviews obtained by the private investigation firm that had worked for Mr. Hoey's prior counsel….
>
> Included in Mr. Hoey's file were my notes, witness interview memos, and witness interviews conducted by a previous investigation firm retained by Mr. Hoey's prior counsel….
>
> One of the agents [who interrogated me] said that "a lot of people" were "going to be arrested" around this matter.  These statements made me think I was a target of their investigation.  I became nervous and frightened, although I knew of no reason why I should be under investigation myself.  …
>
> Agent Baldus asked me if I was sleeping with Hoey, or words to that effect.  I was very taken aback by the question and said no.  …
>
> At some point, the agents asked for the file.  I asked what would happen if I didn't give it to them, and Agent Baldus pulled out a grand jury

subpoena and showed it to me.  I believed then that if I did not turn over the file, I would immediately have to go to the grand jury and would not even have time to retain counsel or speak to Mr. Richman. …

Baldus told me that they had looked into the issue and that the privilege enjoyed between attorneys and clients did not apply to my work as a private investigator for Mr. Richman.  …

The agents continued to talk to me after I had given them the file, and also asked me questions, sometimes pressing me for answers.  During that conversation, I revealed specific facts and defenses that I had learned through communications with Mr. Hoey and Mr. Richman.   …

I told the agents that I did not believe they had a case and why.

(Exhibit 4 at ¶¶1,8,9,19,24).

Baldus' statement that privilege did not apply was plainly false.  His reckless question relating to whether Johnson had a sexual relationship with Hoey, which he actually admitted at the Hearing (H.at 223), was designed to intimidate and humiliate Johnson, and to make a case against Hoey by hook or by crook. Johnson was treated in this awful manner even thought she was only considered a fact witness in this case and not a subject or target. (Ex.6, ¶5; H. at 52-53, 217).   These agents were out of control, probably because they were investigating the death of the sister of a former colleague. The fact that Hoey may have been guilty of certain crimes, but not all, that the agents were investigating (and, indeed, Hoey later pleaded guilty to narcotics, obstruction and tampering offenses), does not excuse this violation of his rights.   Even the guilty are entitled to the protection of the attorney client and work product privileges.

Baldus told Johnson, as stated in his affidavit, that if she did not give him the file, he would serve her with a grand jury subpoena for it. (Ex. 2 ¶13).[3] But even after she gave it to him, he served Johnson with a grand jury subpoena anyway. The file was brought to the U. S. Attorney's office where it was reviewed and read by the agents and the AUSAs in charge of the investigation. (Ex. 2 at ¶ 6, 16; Ex.6 at ¶ 4).

Over the next several days efforts were made to get Johnson to meet with the prosecutor and to testify before the grand jury. The Government had learned much from Johnson and wanted to get the evidence before the grand jury in a hurry. A meeting was arranged for March 4, 2013. On March 1, 2013, Richman called the prosecutor and objected to further interviews of Johnson based upon privilege issues. On March 4, Richman and Garnett spoke and Richman was given time to assess the matter and determine whether he wished to move to quash the subpoena served upon Johnson. (Ex.1 at 10-11; Ex. 6 at ¶5-7).

On May 28, 2013, before any indictment was filed against him, Hoey moved in Part One to quash the grand jury subpoena served on Johnson and to disqualify the prosecutors and the agents from the grand jury investigation, who had reviewed the investigator's file and interrogated Johnson about her communications with

---

[3] In the same affidavit in which Baldus stated that he told Johnson that he would give her a subpoena if she did not give him the file, he also stated, contradicting himself, that he gave her the subpoena when he first went into the apartment. (Ex. 2,¶5).

Hoey.   A hearing was held before Judge Stein beginning on July 31, 2013 at

which Richman, Johnson, Baldus, Eileen Moynahan, and Agent Finning testified.[4]

At the conclusion of the hearing, Judge Stein reserved judgment on the issues.

On December 19, 2013, Hoey and Noriega, who had given an exculpatory

statement to Johnson when she interviewed him, which was read by the

Government when her file was taken, were indicted.   Hoey was indicted for

charges including distributing cocaine to Kalo which resulted in her death, along

with obstruction of justice and witness tampering. (Ex.8).  AUSA Garnett, who

was the subject of the pending motion to disqualify, ignored the pending motion to

disqualify her and presented the case to the grand jury.  There is no reason why

another AUSA, unaware of privileged material, could not have presented the case

to the Grand jury.  Also, while there was a potential statute of limitations issue (the

statute would have arguably run on January 9, 2014), the Government could have

sought a temporary waiver of the statute permitting the parties to await Judge

Stein's decision, but it never requested one from Hoey's attorneys.   If a defense

attorney had performed an act at a time when there was a pending motion to

prohibit her from performing that act, the Government's and the Court's reaction

_____

[4]      At the hearing Agent Finning testified that Kim Kalo's brother, the former
ASAC in New York, had called him approximately two weeks before his
testimony and was pressing him on the investigation. (H. 362-363).  Agent
Moynahan testify to an analysis of telephone contacts involving Hoey, Johnson
and Richman.

would have been aggressive.   Here, nothing occurred notwithstanding Hoey's complaints to Judge Stein.

On June 24, 2014, Judge Stein granted Hoey's motion to quash in part and denied it in part.   He found that Johnson was Richman's agent, and that the privilege fully applied under *United States v. Kovel*, 296 F. 2d 918 (2d Cir. 1961), contrary to the Government's contention that Johnson was merely Hoey's agent, and not Richman's agent.  (Ex. 1 at 12-14).   Thus, all of the interview reports in the file were privileged at the time they were prepared.  Judge Stein also found that Hoey's communications with Johnson, which Johnson disclosed to the agents, were privileged.  Judge Stein specifically referred to one conversation that Johnson had with Hoey, which she revealed to the agents, that was protected by privilege. In this conversation Hoey, according to Johnson, informed Johnson that a "bag of money" could be given to a potential witness.  (Ex. 1, at 18).  It is unknown how this privileged communication has been exploited by the Government and where it has led.

There were only two situations between Hoey and Johnson which Judge Stein found were not privileged because of the crime fraud exception to the privilege.    These situations related to an April 2011 attempted meeting with Zobkiw and a May 2011 meeting at a warehouse with Zobkiw.  (Ex. 1 at 16-18).

With respect to the numerous privileged documents in Johnson's file, Judge Stein found that Hoey had waived both the attorney client privilege and work product privilege and the Government was therefore free to exploit these materials. (Ex. 1, at 18).  Undoubtedly the Government took, and continues to take, full advantage of the contents of privilege material in the file, along with the privileged communications between Johnson and Hoey which Johnson was induced to reveal. As of today we simply do not know whether these exploitations led directly or indirectly to evidence supporting the instant indictment.  We do know, as noted, that Baldus has been attending court proceedings in this case and that agents who arrested Hoey on the narcotics case in December 2013 also arrested him on the case here as well.  (Ex. 7).

**<u>Argument</u>**

Judge Stein's finding of waiver with respect to the documents in the file was erroneous.   Judge Stein analyzed the waiver issue based upon four factors which are used to determine waiver in civil cases involving inadvertent disclosure of privilege materials.   He held that these factors should also apply in cases of unauthorized disclosure in criminal cases.    The factors are 1) the reasonableness of the precautions taken by the producing party to prevent inadvertent disclosure; 2) the volume of the discovery versus the extent of the specific disclosure at issue; 3) the length of time taken by producing party to rectify the disclosure; and 4) the

fairness of the issues.   *United States v. Rigas*, 281 F. Supp 2d 733, 738 (SDNY 2003); Rule 502(b) of the Federal Rules of Evidence. (Ex. 1, at 18-19).

This case involved a deliberate violation of privilege based on threats of prosecution and false statements.  Judge Stein's finding of waiver essentially rewarded the Government for premeditated illegal conduct.  This is especially clear because Baldus falsely told Johnson that he had looked into the issue of privilege and it did not apply.[5]  *Kovel* of course dictated just the opposite.   The overriding issue of fairness dictated a finding against waiver.

Judge Stein relied primarily on Richman's failure to act for two weeks after he learned the next day of what happened.    But Richman's delay was insignificant.  See *United States v. Nunez*, 2013 WL 4407069 (S.D.N.Y. Aug. 16, 2013), which refused to find waiver in a criminal case despite a 90-day delay, in a case in which the privileged material, like what essentially occurred here, was seized.   Richman certainly would have believed that as the agents and prosecutors already read the file, and digested what Johnson told the agents about her communications with Hoey, the harm already occurred.   There was no way Richman could move to strike the tainted information from their minds.   He

---

[5]  Baldus of course denied this.   Judge Stein's opinion credits Johnson's testimony generally (e.g., H. at 20), but he does not mention this specific contradiction. Judge Stein did categorically reject Baldus' testimony that Johnson told him that she worked for Hoey and not for Richman, squarely finding that Johnson worked for Richman.

certainly was entitled some time to think the matter through.  In retrospect of course one could say he should have moved immediately to disqualify the prosecutors and agents, and insist that other prosecutors take charge who had not read the privileged material.    Realistically, however, he needed some time to assess the situation, especially because he knew that Hoey was not in danger of immediate indictment.  He knew this because he was aware the Government was still attempting to place Johnson before the grand jury.    However, Richman did tell AUSA Garnett on March 1, 2013 that he objected to the Government's further attempts to speak with Johnson, and to place her before the grand jury, and this objection succeeded.  He also told Johnson that further disclosures could make her liable to Hoey. (Ex.2,¶14).   On March 4, 2013 Richman informed Garnett that he needed more time to assess the issues which he was given.   (Ex.1, at 20-21; Ex. ¶2).

Criteria relating to inadvertent disclosures in civil cases should not control in the context of deliberate Government recklessness, false statements and bad faith in criminal cases.  See *Rigas, supra* at 737(collecting cases indicating that inadvertent disclosure "never constitutes waiver"; only "intentional and knowing relinquishment" by the client does this.).   That there was bad faith here is plain. The fact that the agents, knowing that Johnson worked for Richman, went to Johnson's home to interrogate her in the first place, rather than serving her with a

grand jury subpoena, was designed to avoid Richman's involvement.   Informing

Johnson that no privilege applied was an absolute lie.   Asking her, who was not

viewed as anything but a potential witness, if she had a sexual relationship with

Hoey, was unconscionable.  Topping this conduct off was that the very prosecutors

who were the subject to the motion to disqualify flied the narcotics and obstruction

indictment against Hoey, while the motion to disqualify them was pending.  Even

if Richman was careless in not protesting quicker than he did, his carelessness

should not have been used as an excuse to deprive Hoey of his rights in these

circumstances.

Further, an attorney may not even waive the privilege without his client's

consent because "the privilege belongs solely to the client and may only be waived

by him." *In re Von Bulow,* 828 F. 2d 94, 100-01 (2d Cir. 1987).  Of course there

could be implied consent, but there was nothing like that here.

Even if Judge Stein was correct on the issue of waiver with respect to the

file, the Government's conduct here was so "manifestly corrupt" as to require

dismissal.  *United States v. Gartner,* 518 F. 2d 632, 633 (2d Cir), *cert. den.* 423

U.S. 915 (1975); *United States v. Schwimmer, supra.*   Moreover, Judge Stein's

finding that Hoey did indeed have privilege concerning his communications with

Johnson, which she disclosed, necessitates a *Kastigar* type taint hearing as to

whether these privileged communications led to evidence, directly or indirectly, in

the case here.[6]   Indeed, Baldus, who has been attending proceedings in this case,

could have disclosed privilege information to the AUSA on this case who

concededly had nothing to do with violating Hoey's privilege.   Finally, Judge

Stein's holding that privilege was not waived with respect to Hoey's

communications with Johnson is inconsistent with his holding that it was waived

concerning her file.   For Richman did not complain about either for two weeks.   If

there were no waiver of privilege for the verbal communications, there should not

have been waiver for the file.

**2. Evidence seized pursuant to an illegally obtained search warrant must be suppressed and a hearing ordered to determine whether this illegally obtained evidence led to the indictment in this case.**

Hoey was arrested on the earlier indictment on December 19, 2013. This

indictment charged him with narcotics violations in the period from 2005 to 2010,

and obstruction and tampering counts ending in May 2011.[7]   The latest charge

against Hoey in this indictment ended two and one half years before his arrest.    At

the time Hoey was arrested, DEA agents seized cell phones from him.   On January

31, 2014, the Government obtained a warrant to search these phones.   As a result

---

[6]  Hoey pleaded guilty to the earlier indictment before a taint hearing was conducted.   At the time of this plea, in August 2014, the indictment here had not been filed.   The two cases are related.  In fact, the same agents, presumably DEA agents, who arrested Hoey on the first case arrested him on the case here as well. (Ex. 7).  And Baldus has been attending court appearances on the case here.   This is no coincidence.

[7]      The Indictment is appended to Exhibit 8.

of these searches the Government allegedly discovered at least one document which it may seek to offer into evidence in this case.

The affidavit for the warrant (Ex.8) lacked probable cause.  It was based almost exclusively on the fact that Hoey had just been charged with narcotics, obstruction and tampering offenses and the allegation that people who are charged with such crimes usually possess cell phones which contain evidence.  Here, however, the alleged offenses in the indictment ended years before the warrant was issued.  There is nothing in this affidavit which provides evidentiary support for the proposition that Hoey was then currently involved in narcotics or any other type of wrongdoing other than unsupported conclusions.  At the very least the so-called probable cause was stale.  *United States v. Falso,* 544 F. 3d 110, 122-23 (2d Cir. 2008) (information about prior conviction stale because conviction occurred 18 years earlier).

The Government's position is essentially that if you are indicted for any offense that occurred years before, cell phones you possess when you are arrested can be searched even if there is not an iota of evidence that you are then involved in any kind of wrongdoing.  If this warrant is sustained it will give prosecutors the right to seek search warrants for anyone indicted for crimes that occurred years earlier who has a cell phone on him or her at the time of arrest.

Moreover, the document seized from Hoey's phone and which the Government seeks to introduce has nothing to do with narcotics, or obstructions of justice, but it has much to do with the current indictment, and could, indeed, have been the catalyst for beginning the investigation which led to the Indictment here. A hearing is necessary to determine whether this illegally seized document, or others seized at the same time, began a chain of events which culminated in evidence used to obtain the indictment here, thereby requiring the dismissal of the indictment.

Nor can this blatantly insufficient warrant be sustained based upon the good faith exception to the suppression doctrine.   This affidavit is egregiously insufficient on its face.  There was no good faith here.   *United States v. Leon*, 468 U.S. 897, 922-23 (1984); *United States v. Coreas*, 419 F. 3d 151, 155-56 (2d Cir. 2005); *United States v. George*, 975 F.2d 72, 77-78 (2d Cir. 1992) (reliance unreasonable because warrant's authorization to search for "any evidence relating to the commission of a crime" overly broad.)

3. **The Statute of Limitations has run on the 2009 charges.**

The indictment, which was filed on April 13, 2015, alleges in all its counts that Defendant embezzled $350,000 in June 2009.   This 2009 allegation is over five years prior to the filing of the indictment.   As the statute of limitations in this

case is five years, the indictment language alleging this should be stricken or redacted.

## CONCLUSION

The indictment should be dismissed.  Alternatively, a taint hearing should be ordered with respect to the exploitation of privileged communications and documents.   Further, suppression of all evidence derived from the search of Hoey's cell phones should be ordered and a taint hearing ordered on this issue as well.   Finally, the indictment should be redacted to exclude from its charges any events occurring more than five years before it was filed.

Respectfully submitted,

_____/s_____

Dominic F. Amorosa
95 Worth Street, Suite 10J
New York, New York 10013
T; 212 406 7000
C: 718 755 1100
lawoffices@dfamorosa.com

Dated:  November 18, 2015