UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                     -v-

THOMAS HOEY, JR.,

                            Defendant.

------------------------------------------------------------------------X

15 Cr. 229 (PAE)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/21/16

PAUL A. ENGELMAYER, District Judge:

    This decision resolves pretrial motions by defendant Thomas Hoey, Jr.  Hoey is charged with embezzlement, transportation of stolen money, wire fraud, and money laundering in connection with withdrawals from his company's pension plan, used, allegedly, to pay for Hoey's corporate and personal expenses.  Hoey seeks (1) dismissal of the Indictment or a taint hearing, based on the Government's alleged use of privileged information; (2) suppression of evidence resulting from the execution of an allegedly defective search warrant or, alternatively, a taint hearing to determine whether the search led to the present Indictment; and (3) redaction of the Indictment because the statute of limitations has run as to a portion of the charged scheme.  For the reasons that follow, the Court denies Hoey's motions.

## I.    Background

    Hoey's motions require recounting events in connection with an earlier prosecution of Hoey that resulted in his guilty plea to charges including narcotics conspiracy and obstruction of justice.  Those events underlie Hoey's claim that the Government may have used privileged information in investigating and charging this case, tainting the present Indictment.

A.      **The Prior Case**[1]

In the early morning of January 10, 2009, a woman named Kimberly Kalo, with whom Hoey was using cocaine in his hotel room, died.  The New York County District Attorney's Office, and later the U.S. Attorney's Office for the Southern District of New York, investigated Kalo's death, and Hoey retained counsel, Murray Richman, Esq.  Richman, in turn, eventually hired an investigator, Deirdre Johnson, to assist in his investigation.

The third person in Hoey's hotel room on the night Kalo died, a woman named Nicole Zobkiw, was due to testify before a grand jury in this District in early 2011.  Hoey, in advance of her testimony, hired an attorney to represent her.  This attorney, Barry Balaban, Esq., went to Zobkiw's home the night before her grand jury testimony.  During this meeting, Balaban coached Zobkiw to give testimony that would tend to exculpate Hoey.  Balaban also tried to get Zobkiw to agree to be interviewed by Johnson, but Zobkiw refused to be interviewed.  Zobkiw then testified to the grand jury as she had been coached to do.

Shortly thereafter, in May 2011, Johnson and Balaban met with Zobkiw in an abandoned warehouse.  Balaban presented Zobkiw with a prepared statement that he pressured her to sign; she eventually signed.  Johnson's work for Hoey ended later in 2011 following an argument.  Zobkiw was later convicted at trial of perjury and obstruction of justice, *see United States v. Zobkiw et al.*, 11 Cr. 337 (PKC), Dkt. 33, and Balaban pled guilty to conspiring to suborn perjury, *see id.*, Dkt. 118.

---

[1] The facts related here are largely drawn from Judge Stein's decision in connection with Hoey's motion to quash the grand jury subpoena of Deirdre Johnson, *see In re Grand Jury Subpoena Dated March 20, 2013*, 13-Mc-189 (SHS) (Part I) (S.D.N.Y. June 24, 2014) ("Part I Decision"), as described herein.  These facts are, unless otherwise noted, uncontested.  The Court makes no factual findings and neither adopts nor rejects Judge Stein's findings.  It presents these facts here for the purpose of background and context.

On February 11, 2013, one and a half years after Johnson's work for Hoey apparently ended, but while the case against Hoey was still under investigation, three federal agents went to Johnson's home. During the course of a long conversation with the agents, Johnson revealed information relating to Hoey's defense and turned over her investigative file. For instance, Johnson "told the agents a great deal" about her attempted meeting with Zobkiw the night before her grand jury testimony, about the meeting in the warehouse, and about other communications with Hoey. Part I Decision at 8–9. The agents also served Johnson with a grand jury subpoena.

On May 31, 2013, Hoey filed a motion to quash that subpoena on the ground that it called for disclosure of information protected by the attorney-client privilege and/or the attorney work-product doctrine, and also moved to disqualify the prosecutors and agents who had read Johnson's file. The Honorable Sidney H. Stein, U.S. District Judge, sitting in Part I, held a hearing on that motion beginning on July 31, 2013.

On December 20, 2013, while the motion was *sub judice*, Hoey was indicted on federal charges (brought before the grand jury by a prosecutor targeted by the motion to disqualify), including conspiracy to distribute and possess with intent to distribute cocaine, conspiracy to suborn perjury, and obstruction of justice.

On June 24, 2014, while the indictment was pending, Judge Stein issued an Opinion & Order on Hoey's motion. He held that (1) communications between Johnson and Hoey were indeed covered by the attorney-client privilege; but that (2) certain communications concerning the attempted tampering with Zobkiw's testimony were not privileged, because the crime-fraud exception applied to them; and (3) Hoey had waived work-product protection and privilege over Johnson's investigative file. *See* Part I Decision.

3

On August 14, 2014, Hoey pled guilty before the Honorable P. Kevin Castel, United States District Judge, to the three charges.  He was later sentenced to 151 months' imprisonment and is presently serving that sentence.  In light of Hoey's guilty plea, no hearing was held on whether the revelation of any privileged communications had tainted the Government's investigation and prosecution of him.  *See* Dkt. 28, Ex. 1, at 2 (order of Judge Castel dated about one month before Hoey's plea, noting that Judge Stein "has indicated that he is prepared to hold a hearing on whether eliciting [one unidentified statement made by Hoey to Johnson] has tainted the prosecution team").  While Hoey had filed a notice of appeal of Judge Stein's decision, he did not perfect that appeal, and it was later dismissed.  *See* Dkt. 25, Ex. B.

**B.      The Instant Case**

On April 13, 2015, a grand jury in this District returned an indictment, charging Hoey with four counts, all arising out of his alleged embezzlement from his company's pension fund.[2] Dkt. 1 ("Indictment").  The Indictment charges Hoey with embezzlement, *see* 18 U.S.C. § 664; interstate transportation of stolen money, *see* 18 U.S.C § 2314; wire fraud, *see* 18 U.S.C. § 1343; and money laundering, *see* 18 U.S.C. § 1957.  *See id.* ¶¶ 12–18.

On November 18, 2015, Hoey filed the instant motions, seeking (1) dismissal of the Indictment or, alternatively, a taint hearing to determine whether the Government used privileged material against Hoey in bringing the Indictment; (2) suppression of evidence seized pursuant to a search warrant and a hearing to determine whether evidence thus seized led to the Indictment; and (3) redaction, on statute of limitations grounds, of the reference in the Indictment to Hoey's embezzlement of $350,000 in June 2009.  Dkt. 22.  Hoey filed a memorandum of law in support

---

[2] The Indictment does not name the company, but identifies it as a Long Island–based wholesaler of bananas and other produce.  Indictment ¶ 1.  Other documents before the Court identify the company as Long Island Banana Corporation.  *See* Dkt. 25, Ex. I.

of this motion, Dkt. 23 ("Hoey Br."), and attached exhibits.  On December 7, 2015, the

Government filed a memorandum in opposition, Dkt. 25 ("Govt. Br."), and attached exhibits.

On December 11, 2015, Hoey filed a reply brief.  Dkt. 29 ("Hoey Reply").

On December 8, 2015, this case was reassigned to this Court.  Dkt. 26.

## II.    Discussion

### A.    Hoey's Demand for Dismissal of the Indictment or a Taint Hearing

#### 1.    The Parties' Arguments

Hoey argues that the present Indictment must be dismissed or, alternatively, that a taint

hearing must be held to determine whether the Government used privileged material, primarily

the work-product material contained in Johnson's investigative file, in bringing the present

charges against Hoey.  Hoey's brief largely challenges as "erroneous" Judge Stein's finding that

he had waived the right to challenge a breach of work-product protection over that file.  Hoey Br.

14.  But he also argues that "[e]ven if Judge Stein was correct on the issue of waiver . . . the

Government's conduct here was so 'manifestly corrupt' as to require dismissal."  *Id.* at 17.

The Government has a number of responses.  It argues that Hoey is collaterally estopped

from re-litigating the waiver issue decided by Judge Stein.  But, it argues, even if Judge Stein's

decision were revisited, no relief is warranted because the present case is "entirely different"

from the prior narcotics case, in the course of which a breach of Hoey's attorney-client privilege

was found.  Govt. Br. 9.  And, the Government argues, Hoey "has not made a sufficient showing

to warrant [a taint] hearing," because he "has not even attempted to demonstrate that the subject

matter of [any privileged] communications is similar or relevant to the conduct for which he is

currently charged."  *Id.* at 13–14.

### 2.    Whether a Taint Hearing is Necessary

As noted, the Government first argues that, to the extent Hoey brings claims based on the alleged breach of his attorney-client or work-product privileges, he is collaterally estopped from re-litigating the issues decided in Part I by Judge Stein, in particular, the finding that Hoey had waived his claims regarding Johnson's investigative file. As the Government notes, Hoey had the right to challenge that finding, but he elected not to do so. Instead, he pled guilty to the then-pending charges and abandoned his appeal of Judge Stein's decision.

The Court has no occasion to reach the issue of collateral estoppel. As explained below, Hoey has failed to connect any information turned over or statements made by Johnson to this separate case. And the Government has convincingly explained why this case is distinct, in subject matter and origin, from the earlier investigation in which any breaches of Hoey's privilege and work-product rights occurred. Thus, even if Hoey were correct that his right to litigate claims arising from those breaches is preserved, resolution of that issue would have no bearing on the present case.

The Court notes, however, that were the issue relevant to the present case, the necessary collateral estoppel inquiry would be more complex than suggested by the Government's briefing. Although the Government is correct that "[c]ollateral estoppel has been applied in criminal cases as well as civil cases," Govt. Br. 5 (citing cases), the cases from this Circuit on which it relies— one from this District, the other from the Second Circuit—do not control, because they involve the application of collateral estoppel *against the Government*. They hold that "the doctrine of collateral estoppel applies in the criminal context to bar a second prosecution where the jury in the first trial, either expressly or by necessary implication, found for the defendant on an issue essential to conviction in the subsequent prosecution." *United States v. D'Amico*, 734 F. Supp. 2d 321, 345 (S.D.N.Y. 2010); *see also U.S. ex rel. DiGiangiemo v. Regan*, 528 F.2d 1262, 1266

(2d Cir. 1975) ("Assuming that the state has had an opportunity for a full hearing on suppression and at least one appeal as of right, we think due process would forbid relitigation of the issue determined adversely to it . . . ."). Another case cited by the Government merely applied the principle that, when there is a "difference in sovereigns," *i.e.*, a state prosecution followed by a federal prosecution or vice versa, use of collateral estoppel is foreclosed to the defendant "except in the most unusual circumstances." *United States v. Davis*, 906 F.2d 829, 833 (2d Cir. 1990). Here, however, the Government seeks to apply collateral estoppel *against a criminal defendant*. Whether it may do so appears unresolved in this Circuit. And other Circuits appear divided. *Compare United States v. McManaman*, 673 F.3d 841, 847 (8th Cir. 2012) (holding defendant collaterally estopped where he "did nothing more 'than reargue the assertions he made' in the earlier suit and offered '[n]o new evidence or changed circumstances'" (quoting *United States v. Rosenberger*, 872 F.2d 240, 242 (8th Cir. 1989))), *with United States v. Harnage*, 976 F.2d 633, 636 (11th Cir. 1992) ("[T]he government may not collaterally estop a criminal defendant from relitigating an issue decided against the defendant in a different court in a prior proceeding.").[3]

The Court instead rules against Hoey because he has failed entirely to connect the instant embezzlement Indictment with the Government's earlier investigation into Hoey's narcotics activities. Hoey is correct that the principles applicable to the fruits of immunized testimony under *Kastigar v. United States*, 406 U.S. 441 (1972), apply to the fruits of breaches of a

---

[3] If Johnson's investigative file had contained materials bearing on the current embezzlement case as well as on the earlier narcotics case, the collateral estoppel inquiry would be further complicated. The Court would have to inquire whether Hoey's failure to pursue claims arising out of the Government's exposure to the narcotics materials in the file barred him from pursuing claims based on other materials in the file relevant to charges (embezzlement) that had not yet been brought, and were not the subject of an investigation known to Hoey, at the time of the Part I litigation before Judge Stein. It is possible that Hoey's earlier abandonment of his breach and taint claims might estop him only with respect to claims as to materials in the Johnson file about which Hoey then had an incentive to litigate.

defendant's attorney-client privilege.  *See United States v. Schwimmer*, 924 F.2d 443, 446 (2d Cir. 1991).  But a taint hearing is not required merely because a defendant has *asserted* that a prosecution is tainted by the Government's use of immunized testimony (or privileged communications).  Rather, the defendant must demonstrate a "factual relationship" between the protected information and the present prosecution.  *United States v. Blau*, 159 F.3d 68, 72 (2d Cir. 1998) (citing *United States v. Mariani*, 851 F.2d 595, 599–600 (2d Cir. 1988); *United States v. Nemes*, 555 F.2d 51, 55 (2d Cir. 1977)).

Specifically, to trigger a taint hearing, Hoey must make a "threshold showing" that the current prosecution for embezzlement (and related crimes) is factually related to the privileged information that Government agents gleaned from Johnson during the narcotics investigation, or otherwise show "a distinct, as opposed to a speculative, possibility of taint."  *United States v. Helmsley*, 726 F. Supp. 929, 933 (S.D.N.Y. 1989).  Further, there must be a "connection between the *content* of the evidence" to be used in the present prosecution and the protected information; otherwise, the "policies underlying the Fifth Amendment" are not implicated.  *United States v. Helmsley*, 941 F.2d 71, 82 (2d Cir. 1991) (emphasis added).  As the Second Circuit explained: "If a grand jury witness testifying under a grant of immunity were recognized by a grand juror as the perpetrator of a bank robbery committed the week before, an undeniable causal link between the immunized testimony and a conviction for bank robbery would exist, but a plausible Fifth Amendment argument could not be made."  *Id.*  Thus, if there is no "possibility that the content of the testimony of the prosecution's witnesses was affected by the [privileged information]," the prosecution would not be tainted.  *Id.*

Here, Hoey pays strikingly little attention to the fact that the present Indictment concerns a different subject matter than that of the investigation addressed by Judge Stein.  Rather, Hoey,

*ipse dixit*, largely treats it as a given that the charges are interwoven and arose from a common investigation. But in attempting to link the current embezzlement prosecution with the Johnson interview, Hoey points, concretely, to just two facts: that (1) "the same agents . . . who arrested Hoey on the [narcotics] case arrested him on the [embezzlement] case"; and (2) one of the agents who interviewed Johnson, DEA Special Agent Eric Baldus, has attended court appearances in this case. Hoey Br. 18 n.6. The Government counters that these two facts do not support a claim of a common investigation or a claim that the present investigation is tainted.

As to the first, the Government concedes that one agent involved in the embezzlement investigation (IRS Special Agent Denise Chartier) had been on the arrest team in the narcotics case. *See* Govt. Br. 11.[4] And Chartier further acknowledges in her sworn declaration that she had participated in pre-arrest surveillance of Hoey and his co-defendant in the narcotics case, and that, post-arrest, she reviewed financial records and participated in an interview of a restaurant employee. Dkt. 33, Ex. 1 ("Chartier Decl."), ¶ 2. But, Chartier attests, she has "no knowledge of any information disclosed by Deirdre Johnson to law enforcement agents and/or prosecutors," and has not reviewed or been made aware of the contents of the investigative file Johnson turned over. *Id.* ¶ 4. This refutes Hoey's conjecture that Chartier "may have been briefed on the interrogation of Johnson." Hoey Reply 3. With Hoey having adduced no contrary evidence, the Court has no reason not to credit Chartier's declaration. Simply put, there is no non-speculative reason to conclude that Chartier was exposed to the fruits of any breach of Hoey's privileges, let alone that such exposure helped bring about the current prosecution of Hoey for embezzlement.

---

[4] Hoey attests that Chartier and a second, unidentified female agent who arrested him in the instant matter both told him they were present the night of his arrest in the narcotics case. *See* Dkt. 23, Ex. 7. He does not allege any further role by these agents in his narcotics case.

As to the second point, Baldus's attendance at court appearances in this case does not support a claim of taint, either.  That an agent involved in a lengthy separate investigation of Hoey would retain an interest in other criminal proceedings against him is not sufficient to raise a credible claim of taint.

Finally, the assembled circumstances and the chronology of events undermine Hoey's notion that this case is based or built on the Government's access to privileged or work-product materials obtained from the agents' interaction with Johnson during the narcotics investigation. The subject matters of the two indictments are completely distinct.  And the Government has shown, without contradiction, that the embezzlement investigation had an independent source. As the Department of Labor ("DOL") investigator who initiated the investigation leading to the present Indictment attests, DOL's investigation into Hoey's company pension plan began in March 2014.  Dkt. 33, Ex. 2 ("Randolph Decl."), ¶ 2.  It was triggered by the filing with DOL of a complaint by a family member of a plan beneficiary.  *Id.*  The investigator attests that she has no knowledge of any information disclosed by Johnson.  *Id.* ¶ 3.  And the two Assistant United States Attorneys responsible for the present investigation and prosecution have filed declarations similarly attesting to the absence of taint.  They attest that the only knowledge they have of the substance of Johnson's disclosures or of her investigative file comes from Hoey's own motion papers in this case, from Judge Stein's decision (which was attached thereto), and from representations by Hoey's counsel during a recent conference before the Court addressing the present motion.  Dkt. 33, Exs. 3 & 4, ¶ 3.  The prosecution team's knowledge of Johnson's disclosures thus post-dates by months the April 2015 return of the Indictment in this case, and derives from disclosures by Hoey's counsel in the present case.  The AUSAs' unrefuted attestations contradict the scenario imagined by Hoey in which Baldus "could have disclosed

privilege [sic] information to the AUSA on this case who concededly had nothing to do with violating Hoey's privilege."  Hoey Br. 18.

Under these circumstances, Hoey has not identified a non-speculative basis on which to claim that the DOL investigation leading to the present Indictment was in any way tainted by the Johnson interview in the course of the narcotics investigation.  Hoey has not come forward with facts calling into question whether the embezzlement investigation had an independent origin and content, or raising a non-speculative "possibility that the *content* of the testimony of the prosecution's witnesses was affected by the [privileged information]."  *Helmsley*, 941 F.2d at 82 (emphasis added).  And, as noted, the Government has come forward with affirmative attestations from the key principals which squarely refute this claim and explain the independent origins and path of the investigation that led to the present Indictment.

Further, the Government represents that the evidence in this case, establishing the unauthorized misapplication of pension plan funds, will largely consist "of bank, financial and [pension plan] records" and "testimony from plan participants and witnesses involved in the administration of the Plan."  Govt. Br. 2.  There is nothing to connect Johnson's interview or her investigative file with any such evidence.  There is, therefore, no reason to believe that any evidence presented in this case will derive, directly or indirectly, from the Government's interview of Johnson in connection with the narcotics case.

Because Hoey has failed to make the showing necessary to trigger a hearing into whether the present Indictment is tainted, his motion for such a hearing is denied.

### 3.    Whether Dismissal of the Indictment is Necessary

It follows, *a fortiori*, that Hoey's motion for dismissal of the Indictment on grounds of taint must be denied.  Hoey's claim that "the Government's conduct here was so 'manifestly corrupt' as to require dismissal," Hoey Br. 17, does not alter this result.

11

It is true that the Second Circuit has recognized the possibility that the Government's interference with the attorney-client relationship in a particular case could be "so manifestly or avowedly corrupt" as to require dismissal. *United States v. Gartner*, 518 F.2d 633, 637 (2d Cir. 1975); *see also Schwimmer*, 924 F.2d at 447. But, the Circuit has also held, "[e]ven intentional intrusion by the government into the attorney-client privilege does not require automatic reversal." *United States v. Sanin*, 113 F.3d 1230, at *4 (2d Cir. 1997) (unpublished decision). Rather, a defendant must ordinarily demonstrate prejudice stemming from the Government's conduct. Here, Hoey has completely failed to do so. His motion instead seeks to capitalize on government misconduct in a prior investigation—one which culminated in Hoey's guilty plea— to obtain benefit in this case.

Moreover, to the extent that courts have recognized that particularly flagrant and sweeping violations of attorney-client privilege may justify dismissal of an indictment based on an assumed but not a concrete showing of taint, this case presents a far cry from such scenarios. *Compare Coplon v. United States*, 191 F.2d 749, 760 (D.C. Cir. 1951) (government wiretapped defendant's phone calls with her attorney before and during trial); *Caldwell v. United States*, 205 F.2d 879, 880 (D.C. Cir. 1953) (government agent worked for defense with full access to defense team); *United States v. Lusterino*, 450 F.2d 572, 574 (2d Cir. 1971) (government falsely held out an informant as a co-defendant and the informant testified against defendant), *with United States v. Mosca*, 475 F.2d 1052, 1060 (2d Cir. 1973) (government permitted cooperating co-defendant to participate in conferences with other defendants); *United States v. Rosner*, 485 F.2d 1213, 1226 (2d Cir. 1973) (co-defendant decided to cooperate with the government but was not "intruding agent[]" of government).

Further, in the cases on which Hoey relies, the moving defendants sought to invalidate their convictions on the grounds that the Government had interfered with the defendant's attorney-client relationship in the course of building or making its case.  In such circumstances, it is more reasonable to assume prejudice than where, as in this case, any breach occurred in the lead-up to a *different* indictment from the one that is sought to be dismissed, and the defendant has shown no link between the alleged misconduct and the instant Indictment.  The Government is, thus, correct, that "even if dismissal of some indictment were warranted, it certainly would not be dismissal of the instant Indictment."  Govt. Br. 12 (emphasis in original).

### B.       Hoey's Challenge to the Search Warrant

Hoey next argues that "at least one document" that the Government may offer at trial in this case was discovered during the execution of an illegally obtained search warrant after Hoey's arrest in the narcotics case.  Hoey Br. 19.  He seeks both to suppress this document and to hold a hearing to determine whether it resulted in the present Indictment.  *Id.* at 18.

### 1.       Factual Background

On January 31, 2014, the Honorable Henry B. Pitman, United States Magistrate Judge, signed a search warrant authorizing the search of, *inter alia*, four cellphones found on Hoey's person at the time of his December 2013 arrest in the narcotics case.  Dkt. 23, Ex. 8 ("Search Warrant"), at 3.  Among the information covered by the warrant was "[a]ll files containing text . . . stored on the Cellphones."  *Id.* at 4.

In the application for the warrant, Special Agent Baldus recounted the history of the Hoey investigation.  In pertinent part, Baldus attested that there was probable cause to believe that the cell phones had been used in and would contain evidence of the charged crimes, based on "[his] training and experience, as well as . . . the nature of the charged conduct, the circumstances surrounding the arrest of [Hoey and his co-defendant], including their attempts to

13

resist arrest, and the number of cellular telephones seized." Dkt. 23, Ex. 8 ("Search Warrant Affidavit"), ¶ 19. Baldus related that, at the time of his arrest, Hoey initially tried to evade law enforcement, that he was observed on his cellphone immediately before the arrest, that an associate of Hoey's aggressively approached Baldus as he was making the arrest, and that while Baldus was interrupted Hoey grabbed a cellphone on his person and attempted to make a call. *Id.* ¶ 12. Baldus's application further stated that several witnesses told him that, during the period of 2005 to 2010, they saw Hoey distributing cocaine and that he "often had multiple cellular telephones and would frequently change his phone number, which based on my training and experience, is often something narcotics traffickers do." *Id.* ¶ 9.

In the course of executing the search warrant, agents discovered a letter on one of Hoey's cellphones, apparently from the third-party administrator of his company's pension plan. It notified Hoey that the removal of assets from the pension plan constituted "prohibited transactions" and warned him of "large penalties." *See* Dkt. 25, Ex. I ("Letter"). The Government may offer the Letter as evidence at trial.

## 2. The Parties' Arguments

Hoey makes three arguments for suppression of the Letter, or for a taint hearing. First, he argues, the search warrant affidavit did not recite probable cause, including because it relied on stale information regarding Hoey's involvement in narcotics trafficking. Second, he argues, the pension-plan administrator's Letter had "nothing to do" with the crimes for which Hoey was then under indictment (*e.g.*, narcotics crimes and obstruction of justice); he theorizes that the Letter may "have been the catalyst for beginning the investigation which led to the Indictment here." Hoey Br. 20. Finally, Hoey argues, the exception to the probable cause requirement allowing agents to rely in good faith on facially valid warrants does not apply because the affidavit "is egregiously insufficient on its face." *Id.*

14

The Government responds that the information in the search warrant was not stale, including because it recited information from a confidential source that Hoey and an associate, Joseph Izzo, were *presently* "involved in illegal activities, including drug trafficking, to support [Hoey's] business."  Search Warrant Affidavit ¶ 10(c).  The Government further argues that the Letter was within the warrant's scope and was properly seized in plain view because its incriminating nature was "immediately apparent."  Govt. Br. 23.  Finally, the Government argues, even if the warrant had been wrongly issued, the good faith exception would apply because the warrant was not facially deficient.

### 3.        Validity of the Warrant

Where a search has been conducted pursuant to a court-authorized warrant, "great deference" is due to a magistrate's determination that there is probable cause to search the premises.  *United States v. Leon*, 468 U.S. 897, 914 (1984) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)) (internal quotation marks omitted).  "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  And the reviewing court's task is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed."  *Id.* at 238–39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

"In determining whether probable cause exists, the magistrate is required to assess whether the information adduced in the application appears to be current, *i.e.*, true at the time of the application, or whether instead it has become stale."  *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991).  "The two critical factors in determining staleness are the age of the facts alleged and the nature of the conduct alleged to have violated the law.  Where the affidavit

establishes a pattern of continuing criminal activity, such that there is reason to believe that the cited activity was probably not a one-time occurrence, the passage of time between the last alleged event and the warrant application is less significant." *United States v. Raymonda*, 780 F.3d 105, 114 (2d Cir.) (citation and internal quotation marks omitted), *cert. denied*, 136 S. Ct. 433 (2015).

Measured against these standards, the factual recitations in the search warrant affidavit clearly established probable cause to search Hoey's cellphones. Hoey's claim that the affidavit solely concerned years-old criminal conduct is simply incorrect.[5] In fact, as the Government notes, the affidavit recounted statements from a confidential informant to the effect that Hoey's company was *presently* involved in "illegal activities, including drug trafficking, to support the business." Search Warrant Affidavit ¶ 10(c); *see also id.* ¶ 10(d) ("[The confidential informant] has also been informed by similarly knowledgeable individuals that Long Island Banana and Joseph Izzo [the associate who was present during Hoey's arrest] *are* involved in the distribution of illegal drugs through the business.") (emphasis added).[6]

---

[5] The affidavit specified the "2005-2010 time period" as the period when witnesses had seen Hoey distribute cocaine and use multiple cellphones. *See* Search Warrant Affidavit ¶ 9. And the indictment eventually returned against Hoey charged him with narcotics crimes during this time period. *See* 11 Cr. 337, Dkt. 56, at ¶ 1. But Hoey's exclusive emphasis on this time period overlooks the evidence recited in the affidavit of an ongoing *present* drug-dealing operation, and the fact that Hoey was arrested with four cellphones supported the theory that he continued to use multiple cellphones in connection with his narcotics activities.

[6] Even if the Court focused on the fact that the cited paragraphs do not explicitly name Hoey—but rather name his associate and his company—they supplied, taking the affidavit as a whole and reading the cited paragraphs in context, sufficient contemporaneous indications of ongoing criminal conduct by Hoey. *See United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993) ("Facts of past criminal activity that by themselves are too stale can be sufficient if the affidavit also establishes a pattern of continuing criminal activity so there is reason to believe that the cited activity was probably not a one-time occurrence.").

The facts recited in the affidavit also supplied probable cause to believe that the cellphones seized incident to Hoey's arrests contained evidence of his narcotics trafficking. Courts have commonly have found probable cause to search cellphones possessed by defendants arrested in connection with ongoing drug-distribution crimes based on the experience of agents familiar with narcotics trafficking that traffickers commonly use cellphones to communicate in the course of their narcotics distribution, as well as to store relevant information, including the names and contact information of suppliers, purchasers, and confederates.  *See, e.g.*, *United States v. Barret*, 824 F. Supp. 2d 419, 448 (E.D.N.Y. 2011); *United States v. Lam*, No. 05 Cr. 104S, 2006 WL 2864019, at *5 (W.D.N.Y. May 23, 2006), *report and recommendation adopted sub nom. United States v. Tran*, 2006 WL 2884144 (W.D.N.Y. Oct. 4, 2006); *United States v. Wiseman*, 158 F. Supp. 2d 1242, 1249 (D. Kan. 2001).  Analogously, the Second Circuit has found probable cause to search the homes of suspected drug dealers based substantially on evidence of the dealer's distribution activities *outside* the home and testimony from the affiant that drug dealers are likely to keep evidence of their crimes *in* their homes.  *See United States v. Benevento*, 836 F.2d 60, 70–71 (2d Cir. 1987); *United States v. Cruz*, 785 F.2d 399, 405–06 (2d Cir. 1986).

Here, more particularized evidence connecting Hoey's cellphones to his alleged crimes was presented to the magistrate:  The affidavit stated that "[a] number of witnesses . . . told me that Hoey often had multiple cellular telephones and would frequently change his phone number, which based on my training and experience, is often something narcotics traffickers do."  Search Warrant Affidavit ¶ 9.  Combined with the fact that four cellphones were seized from Hoey's person at the time of his arrest, as well as the suspicious circumstances of that arrest, which suggested a furtive attempt to make a phone call while a confederate distracted the arresting

agent, these attestations easily provided probable cause to believe that Hoey's cellphones were used in committing narcotics crimes and would yield evidence of such offenses.

###     4.      Good Faith Exception

Even if Magistrate Judge Pitman's finding of probable cause were second-guessed and found incorrect, the executing officers plainly acted in good faith in relying on his issuance of that warrant.  The good faith exception therefore provides an independent ground for upholding the search.

"Normally, the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (citing *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).  That presumption does not apply only where (1) the magistrate or judge was misled by knowingly or recklessly false information in the affidavit; (2) the magistrate "wholly abandoned his judicial role"; (3) an affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923.

Here, Hoey's argument that the affidavit was "egregiously insufficient on its face," Hoey Br. 20, appears to be based on the exception for affidavits utterly lacking indicia of probable cause.  This is a "very difficult threshold to meet." *United States v. Falso*, 544 F.3d 110, 128 n.24 (2d Cir. 2008).  Hoey falls far short of meeting it here:  For the same reasons that the Court has held that the affidavit supplied probable cause, the warrant cannot be held "egregiously insufficient on its face."  The good faith exception would thus independently justify the officers in executing the warrant and searching Hoey's cellphones.

### 5.      The Seizure of the Letter

Hoey argues that because the seized Letter did not relate to the narcotics investigation, its seizure was illegal.  *See* Hoey Br. 20.  That is wrong.  Under the plain view doctrine, officers are permitted to seize items suggestive of criminal activity found in plain view:  "[L]aw enforcement personnel may seize an item without a warrant provided that it is 'immediately apparent that the object is connected with criminal activity,' and further provided that the officers viewed the object from a lawful vantage point."  *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 82 (2d Cir. 2002) (Sotomayor, J.) (quoting *United States v. George*, 975 F.2d 72, 78 (2d Cir. 1992)).  So long as the scope of the search "was no more intrusive than necessary," it is "of no constitutional moment that the object found was not what was sought."  *Id.* at 81–82.

Here, the agents were permitted, pursuant to the warrant, to search Hoey's cell phones for text documents, and the Letter, being a "file[] containing text," fell within the warrant's scope. Search Warrant at 4.  The officers were thus necessarily in a "lawful vantage point" when they uncovered the Letter.  *$557,933.89, More or Less, in U.S. Funds*, 287 F.3d at 82.  The agents were entitled to examine the letter briefly to determine if it was responsive to the warrant.  *See Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976) ("In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.").  The principle that an executing agent has "leeway in searching computers for incriminating evidence within the scope of materials specified in the warrant," *United States v. Graziano*, 558 F. Supp. 2d 304, 317 (E.D.N.Y. 2008), equally applies to cellphones serving as document repositories.  *See Riley v. California*, 134 S. Ct. 2473, 2489 (2014) ("One of the most notable distinguishing features of modern cell phones is their immense storage capacity.").  There is thus no viable claim (and Hoey no more than feints at one) that the search was overly intrusive in scope.

Finally, it would have been "immediately apparent" that the Letter was "connected with criminal activity." *$557,933.89, More or Less, in U.S. Funds*, 287 F.3d at 82.  The Letter on its face warns—in red-bolded and yellow-highlighted font—that "prohibited transactions" could subject Hoey to "large penalties" from the Government, and that Hoey should repay the money removed from the pension plan to be "in good standing with Federal Law."  And the context in which the agents were investigating reinforces the agents' concern that the Letter signaled criminal activity (although the plain text would be sufficient in itself).  *Cf. United States v. Andino*, 768 F.3d 94, 100 (2d Cir. 2014) (taking into account fact that an officer who observed plastic baggie with "white milky residue inside" had been informed that cocaine was kept in the house, and such baggies are known tools of the drug trade).  Here, as the affidavit for the search warrant reflected, the Government had evidence that Hoey's company was connected to his drug-dealing operations.  *See* Search Warrant Affidavit ¶ 10.  In that context, an agent who found a letter stating that Hoey's company was engaged in "prohibited transactions" had ample basis to suspect that the Letter was connected with, or indicative of, criminal activity.

For these reasons, the letter was lawfully seized.  There is no basis to suppress it or to award any other relief based on its receipt.

## C.     The Statute of Limitations

Hoey next seeks a redaction of the Indictment, on the theory that it charges Hoey with time-barred conduct.  He notes that each count in the Indictment, filed in April 2015, alleges that, in addition to later acts of embezzlement in 2010 and 2012, he embezzled $350,000 on or about June 11, 2009.  *See* Indictment ¶¶ 7, 12–18.  The statute of limitations for each crime charged is five years.  Therefore, Hoey argues, the language pertaining to the 2009 embezzlement "should be stricken or redacted."  Hoey Br. 21.  The Government counters, first, that the evidence of Hoey's 2009 embezzlement will be admissible at trial, and, second, that this act may properly be

treated as part of Hoey's criminal scheme, notwithstanding its date, because it was part of a continuing offense that continued into the limitations period.  Govt. Br. 24.

It is premature to resolve any of these questions until closer to trial.  Assuming a motion *in limine* is made on this point, the Court will then be called upon to decide whether the evidence of Hoey's 2009 embezzlement is admissible, and if so, on what theory.  That ruling, in turn, will shape the Court's decision as to whether, at the time of any jury deliberations, it will be necessary to redact references to Hoey's 2009 embezzlement from the Indictment as the jury sees it.

At least three potential outcomes suggest themselves.  One possibility is that Hoey's 2009 embezzlement will be held part of a continuing offense.  Each count in the Indictment alleges that Hoey's criminal acts occurred beginning in 2009.  If his offense is indeed held "continuing," the statute of limitations would presumably not begin to run until a date after 2009—presumably 2012—when Hoey completed his alleged course of embezzlement from his company's pension plan.

However, pending further legal briefing and explication of the facts, it is premature for the Court to resolve whether Hoey's sequential acts of embezzlement are properly so treated.  An offense is held "continuing" for statute of limitations purposes only where "the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one."  *Toussie v. United States*, 397 U.S. 112, 115 (1970).  "A 'continuing offense' is, in general, one that involves a prolonged course of conduct; its commission is not complete until the conduct has run its course."  *United States v. Eppolito*, 543 F.3d 25, 46 (2d Cir. 2008) (quoting *United States v. Rivera–Ventura*, 72 F.3d 277, 281 (2d Cir. 1995)) (internal quotation marks omitted).  But an

offense is not continuing simply because "a defendant engages in a course of conduct comprised of repeated criminal violations, such as recurring sales of narcotics or a string of separate robberies." *United States v. Rivlin*, No. 07 Cr. 524 (SHS), 2007 WL 4276712, at *2 (S.D.N.Y. Dec. 5, 2007) (citing *United States v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999)). What marks a continuing offense—classic examples include conspiracy, escape, kidnapping, and possession crimes, *see Rivlin*, 2007 WL 4276712, at *2—is that "'each day brings a renewed threat of the evil Congress sought to prevent' even after the elements necessary to establish the crime have occurred." *Yashar*, 166 F.3d at 875 (quoting *Toussie*, 397 U.S. at 122).

As to the offense of embezzlement—the first of four offenses with which Hoey is charged—the Second Circuit does not appear to have spoken to whether it is a continuing offense for statute of limitations purposes. One court in this District has held that 18 U.S.C. § 664, prohibiting embezzlement from a pension plan, does *not* describe a continuing offense, such that conduct antedating the limitations period cannot be prosecuted. *See Rivlin*, 2007 WL 4276712, at *2–5; *see also United States v. Duhamel*, 770 F. Supp. 2d 414, 416 (D. Me. 2011) (same); *United States v. Sampson*, No. 13 Cr. 269 (DLI), 2015 WL 4872551, at *6–9 (E.D.N.Y. Aug. 12, 2015) (embezzlement by government officials under 18 U.S.C § 666 not a continuing offense); *but see United States v. Smith*, 373 F.3d 561, 567 (4th Cir. 2004) (embezzlement of public money under 18 U.S.C § 641 is a continuing offense "[a]t least in those cases where the defendant created a recurring, automatic scheme").

Another possibility is that the alleged 2009 embezzlement will be held admissible at trial, but outside the limitations period. The Government is correct that even if the 2009 embezzlement predates the limitations period, evidence of it may be admissible. Evidence of a defendant's commission of criminal acts predating and/or similar to a charged scheme is often

admitted, under Federal Rules of Evidence 403 and/or 404, as evidence of pertinent background, including to explain the circumstances and context in which the defendant's actions within the limitations period occurred. *See, e.g.*, *United States v. DeFiore*, 720 F.2d 757, 764 (2d Cir. 1983) (evidence of prior acts admissible under Rule 404(b) "even though [they] antedate[] the limitations period"); *see also Duhamel*, 770 F. Supp. 2d at 417 n.1 (holding that, while violations more than five years before the indictment fell outside the limitations period, evidence of such conduct may be "relevant and otherwise admissible"); *United States v. Bruno*, No. 09 Cr. 29 (GLS), 2009 WL 2601249, at *4 (N.D.N.Y. Aug. 21, 2009).  In the event of a ruling admitting the 2009 embezzlement on such a theory, the Court would benefit from briefing as to whether it is proper for the Indictment as furnished to the jury to refer to conduct predating the limitations period.

Finally, it is conceivable that the Court will hold inadmissible altogether evidence of the 2009 embezzlement.  If so, there would be no charter for permitting references to such conduct to be referenced in the Indictment as furnished to the jury.

The Court accordingly denies, as premature, Hoey's motion for redaction.  The Court encourages Hoey to brief the admissibility of this evidence, and the issue of whether the 2009 embezzlement is properly considered part of a continuing scheme, at the time he files motions *in limine* on the schedule set by the Court.

## CONCLUSION

For the foregoing reasons, the Court denies Hoey's motions.  The Clerk of Court is directed to close the motion pending at docket number 22.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: January 21, 2016
       New York, New York