UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

THOMAS HOEY, JR.,

Defendant.

15 Crim. 229 (PAE)

<u>ORDER</u>

PAUL A. ENGELMAYER, District Judge:

The Court has received the attached pro se motion and supplemental motion for compassionate release from defendant Thomas Hoey, Jr.  The Court asks Mr. Hoey's most recent CJA counsel, Kelley Sharkey, to submit a memorandum in support of Mr. Hoey's motion, and to the extent necessary, reappoints Kelley Sharkey to represent Mr. Hoey for this purpose.  This memorandum is due March 22, 2021.  The Government's response is due March 29, 2021.  The Court does not invite a reply.

SO ORDERED.

_Paul A. Engelmayer_
PAUL A. ENGELMAYER
United States District Judge

Dated: March 1, 2021
New York, New York

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,      :

                             :    EMERGENCY COVID-19 FILING

v.                      :

                             :    DOCKET NO. 15-cr-229 (PAE)

THOMAS HOEY,              :

              Defendant.    :

EMERGENCY MOTION TO REDUCE SENTENCE
AND PROVIDE OTHER EQUITABLE RELIEF
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

TO THE HONORABLE PAUL A. ENGELMAYER, U.S. District Judge

Defendant, Thomas Hoey, files this emergency motion to resentence him to a sentence of time-served, followed by a term of supervised release, not to exceed the balance of this original prison sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended by § 603(b)(4) of the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 31, 2018).

Should this Court require additional development of the record before it rules on this motion, defendant requests the appointment of counsel, and request that it conduct an emergency evidentiary hearing to establish that actual threat that COVID-19 poses to this defendant's health and safety, and the current crisis that is being created at FCI Fort Dix ("Fort Dix") by the Bureau of Prisons ("BOP") inexcusable failures to adhere to the Centers of Disease Control and Prevention ("CDC") guidelines,

- 1 -

that further jeopardizes the defendant's well-being for contracting severe illness from COVID-19 that could lead to permanent injury, or death.

## I. PRELIMINARY STATEMENT

Mr. Hoey has two separate cases within the United States District Court, Southern District of New York before District Judge Engelmayer.

In the first case, under Docket No. 11-cr-00337, Mr. Hoey eventually pled guilty to fraud in violation of 18 U.S.C. § 286, fraud, 18 U.S.C. § 371, conspiracy to possess with intent to distribute cocaine, 18 U.S.C. § 1622, conspiring to suborn perjury, and 18 U.S.C. § 1503, obstruction of justice. He was sentenced on April 23, 2015, to 141 month imprisonment to be followed up with a 3 year term of supervision.

In the second case, under Docket No. 15-cr-229, Mr. Hoey went to trial and was found guilty of 18 U.S.C. § 664, embezzlement of benefit plan, 18 U.S.C. § 2314, interstate transportation of stolen money, 18 U.S.C. § 1343, wire fraud and 18 U.S.C. § 1957, money laundering. He was sentenced on July 25, 2016, to 84 months.

Mr. Hoey's statutory release date is December 25, 2023, and his expiration full term is on September 19, 2025. His home confinement projection date is June 25, 2023.[1]

Mr. Hoey is currently designated "out custody" and is currently waiting to be transferred to a federal prison camp.

_____

[1] See Exhibit "A": Sentence Monitoring and Computation Data Sheet.

## II. FACTUAL STATEMENTS

### A. The Rapid Spread of the Novel Coronavirus has Created a Substantial Risk for Defendant

The novel coronavirus's severe acute respiratory syndrome coronavirus 2 (SARS-CovV-2), has rampaged across the globe, altering the landscape of everyday American life, in ways previously unimaginable. Large portions of our economy have come to a standstill. Children have been forced to attend school remotely. Restaurants have closed, workers deemed "non-essential" to our national infrastructure have been told to stay home. Indeed, we now live our lives by terms we have never heard months ago — we are "social distancing" and "flattening the curve" to combat a global pandemic that has, as of the date of this writing, infected over 27 million people in the United States, and killing over 470,000.[2] Each day these statistics move exponentially higher as each day approximately 4,000 deaths are reported because of COVID-19 in the United States.

The unprecedented threat posed by COVID-19, the disease caused by this novel coronavirus, provides a reason for Mr. Hoey's motion for compassionate release to be granted. The incarcerated are particularly vulnerable. COVID-19 is so highly infectious, "only the great influenza pandemic of 1918 (The Spanish Flu as it was then known) is thought to have higher infectivity."[3]

---

2 "Coronavirus Map: Tracking the Spread of the Outbreak," New York Times (Dec. 5, 2020) at: https://www.nytimes.com/interactive/2020/world/coronavirus-map.html

3 See Exhibit "B": Declaration of Dr. Chris Beyrer

As recently stated by Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases, that COVID-19 was his "worst nightmare" - a new, highly contagious respiratory infection that causes a significant amount of illness and death.[4]

"In a period of four months, it has devastated the whole world, and it isn't over yet." It was "unexpected how rapidly," it would spread, he said, "it just took over the planet." And efficiently transmitted disease can spread worldwide in six months or a year, but "this took a month," Dr. Fauci said. He attributed the rapid spread to the contagiousness of the virus, and to extensive world travel by infected people.[5]

"The thing that we don't fully appreciate is what happens when you get infected and you get a serious disease and you recover? What are the long-term durable negative effects of that infection?" Dr. Fauci said.[6]

With growing evidence of re-infection, much is still unknown about this virus and how it effectively attacks the body - research that Dr. Fauci described as "a work in progess." He said that he spent a significant amount of his career studying H.I.V., and that the disease it causes is "really simple compared to what's going on with COVID-19." The difference, he said, includes COVID-19's broad range of severity, from no symptoms at

---

[4] Jen Christensen and Gisela Crespo, "COVID-19 is Dr. Anthony Fauci's 'Worst Nightmare'" CNN (Jun. 10, 2020) at: https://www.cnn.com/2020/06/09/health/fauci-coronavirus-worst-nightmare/index.html

[5] Id.

[6] Id.

all to critical illness and death, with damage to the lungs, heart, kidneys, brain, intense immune response and clotting disorders that have caused strokes even in young people, as well as a separate inflammatory syndrome causing illness in children. According to Dr. Fauci, "where is it going to end? We're still at the beginning of really understanding," and whether "survivors who were seriously ill will fully recover."[7]

There are no long-term survivors of this wholly new disease and the several variants that are currently emerging within the United States. Even its first victims in China are little more than a year removed from their ordeal, but the virus is proving to be a full-body assault, causing damage well beyond the lungs. And even after recovery and are cleared of the virus, health care workers have begun seeing evidence of the infection's lingering effects, from impaired lung function, damaged hearts to loss of smell, as well as hundreds of other symptoms caused by this virus.

No one who hasn't had COVID-19 knows how their body will respond to it because this virus affects people in such variable ways from being asymptomatic, to exhibiting mild to more lingering symptoms, to requiring hospitalization and possible intubation, and to succumbing to the disease, regardless of a person's age or health condition.

The coronavirus doesn't just ravage the lungs - it can

_____

7 Denise Grady, "Fauci Warns That The Coronavirus Pandemic Is Far From Over," New York Times (Jun. 9, 2020) at https://www.nytimes.com/20202/06/09/health/fauci-vaccines-coronavirus.html.

cause severe long-term damage to the liver, brain, heart, kidneys, gastrointestinal tract, skin, and other organs. COVID-19 has been linked to excessive hair loss.[8]

Physicians are seeing growing evidence of the disease's total body assault both in patients being treated in ICUs and those who have recovered from mild to severe cases of COVID-19; however, rapid recovery has not been the experience for tens of thousands - perhaps hundreds of thousands of patients worldwide who've been classified with just mild cases, but continue to struggle for months with symptoms that cause permanent damage.[9]

Another mounting fear is that the coronavirus may lie dormant in people who have recovered, and then spring back years later in a different form. It would not be the first virus to behave that way: the herpes virus that causes chicken pox can hide for decades before it re-emerges as the painful affliction shingles. The virus that causes hepatitis B can sow the seeds of liver cancer years later. And in the month after the West African Ebola epidemic subsided in 2016, the virus responsible for the illness was found to have taken up residence in the vitreous fluid of some of its victims eyes, cause blindness or vision impairment in 40% of those affected.[10]

---

8 Caitin O'Kane, "COVID-19 Could Cause Your Hair to Fall Out," CBS News (Aug. 7, 2020) at: https://www.cbsnews.com/news/covid-19-symptoms-hair-loss

9 Melissa Healy, "Coronavirus May Cause Lasting Damage Throughout The Body," Los Angeles Times (Apr. 10, 2020) at https://news.yahoo.com/coronavirus-infection-may-cause-lasting-22032711.html

10 Id.

Most young people who get COVID-19 get pretty nasty flu-like symptoms but are able to fight off the infection on their own with bed rest and over-the-counter medication. Some, though, have a severe, even deadly case. Why is it that someone seems very healthy and has no underlying conditions, still could be killed by this virus when so many of his peers pull through just fine? The crux of the problem is that, as research reveals the nature of COVID-19. It has become apparent that this is a complex maleficent organism that has profoundly and permanently altered the way we all must live, even with effective vaccines having been developed and administered across the country.

Our understanding of why some people get mild infections while others wind up hospitalized or killed by COVID-19 is still unknown in the United States.[11] But the United States isn't the only country that is seeing large proportions of young people affected by COVID-19. Recently, Dr. Maria Van Kerkhove, head of the World Health Organization's Emerging Diseases and Zoonosis Unit, said, "we are seeing more and more younger individuals who are experiencing severe disease." she explained, "we've seen data from a number of countries across Europe where people of younger age have died. Some of those individuals have had underlying conditions, but some have not."[12]

_____
11 Id.

12 The Daily Briefing, Apr. 13, 2020, Why does COVID-19 Kill Some Young, Healthy People - and Spare Others, at: https://www.advisory.com/daily-briefing/2020/04/13/could-young-people

But there isn't much that is known why some people are getting extremely sick and others aren't. Age is a known risk factor -- the case fatality rate for COVID-19 climbs steeply for patients over 60, but this is true for a lot of infections and generally has to do with diminishing immune systems and underlying health conditions. But this still doesn't answer the question as to why there are so many cases where young people get sick and it quickly turns serious. It's not as simple as pointing to any underlying risk factors, and while there are many hypotheses, some research scientists are looking into genetic mutations that may be the cause for otherwise healthy people to have a more severe or deadly infection.[13]

Another factor being investigated is the infectious dose, or the amount of virus a patient was exposed to when they became ill, which could affect how sick someone becomes ill regardless of their age or health.[14]

There is also a chance that whether or not an individual has already been exposed to COVID-19 can determine how severe a person's infection is. With the dangue virus, for example, the first time someone is exposed to the virus, they often have only a mild infection, but if they encounter it a second time, it can become deadly, and researchers believe this is due to the

---

[13] Id.

[14] Keleigh Rogers, Why are Some Young Healthy People Getting COVID-19? Filed under: COVID-19 Mysteries, FiveThirtyEight, Apr. 23, 2020, at: https://fivethirtyeight.com/features/why-are-some-young-healthy-people-getting-severe-covid-19/

antibodies the body creates after first exposure, which starts to diminish over time. If they drop to a low enough level, they're not able to fight off the virus, but instead they inadvertently assist the virus in infecting cells. It's called antibody-dependent enhancement, and researchers are investigating whether past exposure to this or a similar coronavirus could worsen the symptoms of COVID-19.[15]

Other researchers are looking at whether the microbiome – the menagene of bacteria – could be playing a role. Microbiomes differ from person to person and some microbes have been known to help or hinder an individual's ability to fight off infection.[16]

There's also a strong theory that the virus could be causing what's known as a "cytokine storm" in some young patients. The phenomenon, named after cytokine proteins which are part of the immune system, causes the immune system to overreact to an external pathogen, like a virus. The response ultimately could case a patient's immune system to attack their lungs, causing their lungs to stop delivering oxygen to the rest of their body, and leading to respiratory failure and potentially death.[17]

When COVID-19 was first reported in China, it was described as an unusual pneumonia. And as it spread to Europe

---

15 Id.

16 Id.

17 The Daily Briefing, Why Does COVID-19 Kill Some Young, Healthy People – and Spare Others, at: https://www.advisory.com/daily-briefing/2020/04/13/could-young-people

and the United States, it indeed looked like a severe viral pneumonia, triggering desperate calls for ventilators. But then came reports of coronavirus related strokes and heart attacks. Autopsies revealed abnormal blood clotting, kidney damage, heart inflammation, encephalitis, and even COVID toes.[18, 19]

The catastrophic pulmonary effects of COVID-19 are well documented. However, physicians are currently seeing more evidence of the damage that the infection can do to other organ systems, such as the heart, kidneys, and liver, to name a few.[20]

Scientists are still trying to pin down the exact mechanism underlying these wide ranges of complications. There seems to be two key leading suspects, however. The first is the immune system's defensive inflammatory response to foreign invaders such as viruses and bacteria. That reaction, in turn, may lead to the second culprit: blood clotting. The disease's impact on blood vasculature appears to underline some of the more bewildering effects COVID-19 patients encounter.[21]

---

18 Dr. Max Gomes, Max Minute: Maybe COVID-19 is not just a Respiratory Illness, But also a Vascular One, CBS New York, June 3, 2020, at: https://newyork.cbslocal.com/2020/06/13/coronavirus-covid-19-vascular-disease-endothelial

19 Paul Basilio, COVID-19: Damage Found in Multiple Organ Systems, MD Link, Apr. 5 ,2020, at: https://www.mdlink.com/article/covid-19-damage-found-in-multiple-organ-system/7aEthY85PWzlNutsg7nhrf

20 Id.

21 Diana Kwon, From Headaches to 'COVID Toes,' Coronavirus Symptoms Are a Bizarre Mix Blood Clots and Inflammation May Underlie Many of these Complications, Scientific American, May 18, 2020, at: https:/www.scientificamerican.com/article/from-headaches-to-covid-toes-coronavirus-symptoms-are-a-bizzare-mix1/

Studies have found that this coronavirus infects and damages endothelial cells that line the inside of all blood vessels. These protective cells influence everything from blood clotting to immune response, and the receptor that this virus uses to break into and infect cells is found in virtually every cell in the body, and especially in endothelial cells.[22]

These clotting-related complications cause pulmonary embolisms and stroke among COVID-19 patients. Autopsies have revealed that clots that form on vessel walls fly upward. Clots that started in the calves might migrate to the lungs, causing a blockage called a pulmonary embolism that arrests breathing -- a known cause of death in COVID-19 patients. Clotting in or near the heart might lead to a heart attack, another cause of death. Anything above that would probably go to the brain, leading to a stroke.[23]

The severity of strokes, analyses suggest coronavirus patients are mostly experiencing the deadliest type of stroke, known as large vessel occlusion, of LVD, and they can obliterate large parts of the brain responsible for movement, speech and decision making in one swift blow because they are in the main blood-supplying arteries, and many patients are in their 30's,

---

22 Dr. Max Gomes, Max Minute: Maybe COVID-19 is not just a Respiratory Illness, But also a Vascular One, CBS New York, June 3, 2020, at: https://newyork.cbslocal.com/2020/06/13 /coronavirus-covid-19-vascular-disease-endothelial

23 Ariana Eunjung Cha, Coronavirus Autopsies: A Story of 38 Brains, 87 Lungs and 42 Hearts, The Washington Post, July 1, 2020, at https://www.washingtonpost.com/health/2020/07/01 /coronavirus-autopsies-finding/

their 40's and 50's are left debilitated or dead. Some didn't even know they were infected.[24]

People who recover from COVID-19 may have lingering heart damage and inflammation months after their initial infection, even if they were not hospitalized. A recent study published on July 27 in the journal JAMA Cardiology, involved 100 adults under the age of 53 who had recently recovered from COVID-19. About one-third of the participants required hospitalization while the other two-thirds were able to recover at home. On MRI scans taken more than two months after their diagnosis, about three-quarters of these patients showed signs of heart abnormalities, including inflammation of the heart muscle, or myocarditis. Many patients also had detectable levels of protein in their blood called troponin that can indicate heart injury, such as damage after a heart attack.[25]

These findings are potentially worrisome because heart inflammation may give rise to heart failure, a potentially life-threatening event that occurs when the heart muscle can't pump enough blood to meet the body's normal demands, regardless of age and health.[26]

---

24 Ariana Eunjung Cha, Young and Middle Age People Barely Sick of COVID-19, are Dying of Strokes, The Washington Post, Apr. 25, 2020, at: https://www.washingtonpost.com/health/2020/04/24/strokes-coronavirus-young-patients/

25 Elizabeth Cooney, COVID-19 Infections Leave and Impact on the Heart, Raising Concerns about the Lasting Damage, Stat News, July 23, 2020, at: https://statnews.com/2020/07/covid-19-concerns-about-lasting-heart-damage/

26 Id.

The existence of COVID-19 and the SARS-CoV-2 virus that causes disease has been known for about a year, and since that first case in Wuhan, China, it has infected tens of millions of people around the globe and continues to wreak havoc far beyond the lungs. And so it stands to reason that precise pathogenesis hasn't yet been fully characterized; nevertheless, some of these bizarre and mysterious symptoms linked to COVID-19 start to make sense when they are viewed as manifestations of a vascular disorder, as well as a separate respiratory disease.

As this coronavirus continues to cause devastation throughout the United States, there are countless reports of younger people under the age of 55 dying in alarming numbers, and for some, they are dying when the disease causes only mild symptoms, or they are developing lingering consequences from the virus after exposure, and while there are many studies already underway, it may take years to fully understand why COVID-19 affects people so differently, regardless of age and health.

In the meantime, one year after scientists first identified the novel coronavirus, several variations of the virus that appear to be more infections with a higher degree of mortality are causing global alarm (see CDC's "New COVID-19 Variants" at https://www.cdc.gov/coronavirus/2019/transmission/variant.html), as well as emerging scientific evidence concerning the potential for reinfection (see Apoorua Mandavilli's "You Have Antibodies After Coronavirus, But Not For Long", N.Y. Times at https://www.nytimes.com/2020/06/18/health/coronavirus-antibodies.html).

B.    BOP'S Deliberate Failings To Protect Its Inmate
      Population From COVID-19

The federal prisons, as one federal judge says, are "tinderboxes for infection diseases." See United States v. Rodriguez, No. 9:03-cr-271, Doc. 135 at 2 (E.D. PA. Apr. 1, 2020). Another sounded the alarm this way: "[T]he COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals" and "each day, perhaps each hour that elapses⸢ threatens incarcerated individuals with great peril." See United States v. Scparta, No. 1:18-cr-578, Doc. 69 at 18 (S.D.N.Y. Apr. 19, 2020). The outlook grows more alarming by the day, all the while Mr. Hoey remains in harm's way.

The CDC, the White House, and state Governors have all urged vulnerable people to take immediate, preventative actions, including avoiding groups of people, washing hands frequently with soap, and staying home, separated from other people.  This is a hopeless set of guidelines for federal prisoners, who lack any ability to protect themselves in these urgent way. People in prison and jails are uniquely vulnerable to COVID-19. As Judge Michael L. Brown recently observed, "[d]etained populations also tend to be in poorer health and suffer from higher prevalence of infection diseases then the general population. And to make matters worse, medical care of prisoners is often limited at the best of times." See United States v. Ullings, No. 1:10-cr-406 2020 WL 2394096 at *3 (N.D. Ga. May 12, 2020). These views are supported by the research of Dr. Jaimie Meyer, an infectious

disease expert and professor at the Yale School of Medicine. In her declaration, attached to this motion, Dr. Jaimie Meyer describes the inadequate pandemic preparedness plans in many detention facilities and the difficulty of separating infected or symptomatic inmates from others. In short, the coronavirus is highly transmissible, extraordinarily dangerous and poses a severe threat to even healthy federal inmates.[27]

The conditions of incarceration foster, rather than limit, the spread of the virus. Conditions of confinement allow the contagious disease to thrive. Inmates arrive at BOP facilities from all over the country, and people who work in the facilities leave and return daily. Public health experts believe that incarcerated individuals "are a special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe; "infection control is challenging in this setting."[28] The social distancing that experts advocate as essential to limiting the spread of COVID-19 is impossible in jail and prison facilities. Crowding, inadequate ventilation, and security issues all

---

27 See Exhibit "C" at 2, Declaration of Dr. Jaimie Meyer

28 "Achieving a Fair and Effective COVID-19 Response: An open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders From Public Health and Legal Experts In The United States," (Mar. 2, 2020), available at: https://www.yale.edu/sites/default/files/area/centers/ghip/ documents/final_covid_19_letter_from_public_health_and_ legal_experts.pdf

contribute to the spread of infectious disease.[29] The CDC itself recently noted the dangers of COVID-19 in prisons: "Correctional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and work place components in a single physical setting. The integration of these components present unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors."[30]

The federal prison system simply is not capable of preventing a harrowing outbreak, despite its best efforts. As of January 28, 2021, the BOP reports that at least 3117 inmates, and 1782 staff members have active cases of coronavirus.[31] Since the start of the pandemic, there have been 210 inmate and 3 staff deaths.[32] Currently, another 42,671 inmates and 4,321 staff have recovered from the virus.[33] FCI Fort Dix, Mr. Hoey's institution, has reported over a thousand inmates and dozens of staff currently positive.[34]

Rather than utilize home detention for at-risk inmates for illness or death, the BOP has instead focussed on spending money on purchasing hydroxychloroquine, an unproven remedy that medical

---

29 Michael Kaste, "Prisons and Jails Worry About Becoming Coronavirus 'Incubators'" NPR (Mar. 13, 2020), available at: https:// www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becomeing-coronavirus-incubators

30 "COVID-19 Cases," BOP Online, at: https://www.bop.gov/coronavirus (Last visited, Nov. 26, 2020)

31 Id.

32 Id.

33 Id.

34 Id.

authorities have said will not work to treat COVID-19.[35] The BOP spent $3 million dollars on Ultraviolet (UV) sanitizing devices to combat COVID-19 at 122 federal prisons, regional offices and its central office in Washington, D.C., that the WHO has said is unproven technology, and warned that such UV light technology should not be used on people because it can cause harmful health effects, including skin and eye injuries, but most alarming, such UV lighting causes known cancers, but it is clear that the BOP was not concerned by any of these warnings.[36]

Moreover, heightened COVID-19 risks to inmates and staff came as the BOP technical teams were deployed to confront the peaceful protestors at Lafayette Park in Washington, D.C., and to other cities across the country throughout the summer[37]

Because of these incidents, as well as many other questionable events, the BOP has been under scrutiny, especially for its response to the COVID-19 pandemic, so much so that Pennsylvania Republican Representative Fred Keller introduced a bill to require Senate confirmation for the BOP director.[38]

---

35 Lachlan Markay, "The Bureau of Prisons Just Brought a Ton of Hydroxychloroquine, Trump's Miracle Drug," The Daily Beast (Apr. 7, 2020), at: https://www.thedailybeast.com/the-bureau -of-prisons-just-bought-a-ton-of-hydroxychloroquine-trumps- covid-19-miracle-drug.

36 Courtney Buble, "Federal Bureau of Prisons Spent 3M on Unproven UV Coronavirus Sanitizing Portals," (Aug. 6, 2020), at: https://www.govexel.com/management/2020/08/federal-bureau -of-prisons-spent-3m-unproven-uv-coronavirus- sanitizing-portals/167624/

37 Id.

38 Id.

As recently as mid-October, U.S. Attorney had been opposing compassionate release motions by Fort Dix prisoners, arguing "the BOP has taken effective steps to limit the transmission of COVID-19; however, since the recent transfer of 150 inmates from FCI Elkton, Ohio, the site of one of the worst outbreaks in the country earlier this year, and the likely causes of the current outbreak at FCI Fort Dix, U.S. Senators Robert Menendez and Cory Booker, along with a majority of the State's Congressional Delegation, signed a letter addressed to BOP Michael Carvajal on November 9, 2020, outlining their "grave concerns" over the outbreak at the low security prison.[39]

The BOP generally, and FCI Fort Dix specifically, has claimed that they are actively managing the risks presented by COVID-19 by the BOP's implementation of an "Action Plan" for COVID-19,[40] which the BOP continues to revise and update in response to the fluid nature of the COVID-19 pandemic, and in response to the latest guidance from experts at the CDC, the World Health Organization ("WHO"), and the Officer of Personal Management.[41]

The "Action Plan" started at Phase One on March 13, 2020, and at present, the BOP has implemented Phase Nine of its COVID-19 action plan; however, Phase Nine Action Plan...which looks a lot like Phase Eight...which looks a lot like Phase Seven, begs

---

39 See Exhibit "D": Congressional letter addressed to the BOP Director Carvajel, dated November 9, 2020.

40 Available at: https://www/bop.gov/coronavirus

41 Id.

the question as to whether there is a cohesive plan to actually address the COVID-19 pandemic that has infected over 21,000 inmates, and almost 2,000 staff members, and killed 145 inmates?

However, as disturbing as this may appear, in fact, it appears that the BOP is seeking a "herd immunity" path to solve its problems with the novel coronavirus, that "at some point in the future, and hopefully within the next few months, masks will no longer be necessary, as herd immunity will be achieved based on the number of staff and inmates who have either recovered from the virus or have been immunized."[42]

Herd immunity is a form of indirect protection from infectious disease that occurs when a sufficient percentage of a population has become immune to infection, whether through vaccination or previous infections, thereby reducing the likelihood of infections for individuals who lack immunity; however, this herd immunity approach to COVID-19 will only lead to a deadly disaster because a significant percentage of the population needs to be infected, and it is still uncertain what percentage of the population would need to be immune to the virus in order to attain herd immunity.[43] Further, Dr. Anthony Fauci

---

42 Several images of this email exchange was taken with a contraband mobile cell phone and sent to a third party (Susan Leung), who, in turn emailed them to the Honorable Alison J. Nathan on December 7, 2020.

43 Gypsyamber, D'Souza & David Dawdy: "What is Herd immunity and How Can We Achieve it With COVID-19," Johns Hopkins, Apr. 10, 2020, at: https://www.hspn.edu/covid-19/articles/achieving-herd-immunity-with-covid19.html

has argued that the United States should not pursue herd immunity in its fight against the coronavirus.[44] Just let the virus to run its course in all BOP managed prisons is dangerous, but this appears to be the actual strategy behind Phase Nine when AW Smith alludes within his email that "herd immunity" will be achieved when a sufficient "number of infected staff and inmates" continue to increase to that necessary percentage and recover from the virus.

If the BOP is, in fact, pursuing a strategy of "herd immunity," it would mean that the intent would be for most inmates to become infected with COVID-19 in order to achieve widespread resistance to the disease. Is this the actual strategy behind Phase Nine? AW Smith's words should be a warning of what's to come as this virus continues to wreak havoc across the United States and within the BOP.

Since the coronavirus pandemic began, herd immunity has been floated by some experts as a possible solution to the deadly virus that has so far killed over 450,000 people in the United States, but what would be the price paid if the virus is permitted to run amok within the BOP in order to achieve herd immunity? The pursuit of such strategy would be unconscionable, and as a society, we would have lost our moral authority to allow this to happen.

----

44 Quint Forgey, "Anthony Fauci Rejects Herd Immunity," Politico, Sept. 2, 2020 at: https://www.politico.com/news/2020/09/02/anthony-fauci-rejects-herd-immunity-407747

**C.** **COVID-19 Presents Extraordinary and Compelling Circumstances**

At this point in time, the Court, is well aware of the dangers associated with the coronavirus epidemic, and its particular impact on prison populations. As the Court has stated itself:

> The COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation. It presents a clear and present danger to free society for reasons that need no elaboration. The crowded nature of federal prisons presents an outsized risk that COVID-19 contagion, once it gained entry, will spread. For these reasons, in the past several months, numerous courts, including this one, have ordered the temporary release of inmates held in pre-trial or pre-sentencing custody and, in more limited instances, the compassionate release of inmates serving federal sentences.

United States v. Benjamin, 15-cr-445(15)(PAE)(Sept. 16, 2020), ECF Doc. 1144 at 4 (Decision granting compassionate release).

Indeed, the COVID-19 virus has gained entry into FCI Fort Dix, the correctional facility where Mr. Hoey is incarcerated, and it continues to wreak havoc throughout the prison, however, while the BOP may well be doing everything within its power to combat the spread of COVID-19, it is apparent that these efforts are insufficient under the circumstances. Rather than serve as evidence in support of the Government, this is evidence in support of the defendant, because it shows that even, despite the BOP's best efforts, the virus continues to spread rapidly at FCI Fort Dix. Defendant's harsh conditions, coupled with the increasing number of infections at this prison, constitutes an extraordinary and compelling reason for release.

At Fort Dix, Mr. Hoey lives in a 12-man room, with inmates sleeping in six bunk beds, less than 4 feet apart from another. It is impossible for Mr. Hoey to take the most basic precautions, such as social distancing. He is deeply afraid that conditions at Fort Dix are only going to get worse, with rumors that units on lockdown are already experiencing reinfections of this deadly virus.

As the Second Circuit recently held:

> The First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.

United States v. Zullo, 976 F.3d 228 (2nd Cir. Sept. 25, 2020), 19-3218-cr at 18. In light of the circumstances described above, the Court should join other courts in the Southern District and deem the dire threat posed by the coronavirus to those in prison, especially to those incarcerated in facilities where the virus has taken hold, to be "extraordinary and compelling" under 18 U.S.C. § 3582(c)(1)(A)(i). See e.g. United States v. Ozol, No. 16-cr-692 (JMF) at 2 (S.D.N.Y. June 2, 2020)("as numerous courts have concluded, the threat of COVID-19 to those in prison constitutes an extraordinary and compelling reason for compassionate release"); United States v. Pena, No. 15-cr-551 (AJN), 2020 WL 230119, at *4 (S.D.N.Y. May 8, 2020)("As this court has explained, the COVID-19 pandemic presents and extraordinary and unprecedented threat to incarcerated

individuals.").

Moreover, other district courts have noted their awareness "of the growing evidence of the BOP's chronic mismanagement of the vulnerable population during this COVID-19 pandemic." Woodard v. United States, 469 F.Supp.3d 499, 2020 WL 3528413, at *3 (E.D. Va. 2020); see also Wilson v. Williams, 2020 WL 2542131, at *1-2 (N.D. OHIO, May 19, 2020)(documenting the "unacceptable" percentage of positive tests at FCI Elkton and BOP's "ineffectiveness ... at stopping the spread"); United states v. Esparza, 2020 WL 1696084, at *2 (D. Idaho, Apr. 7, 2020)(the likelihood of contracting the virus is greater in prison than if a defendant were able to fully self-isolate at home); see also United States v. Stephens, 447 F.Supp.3d 63, 65 (S.D.N.Y. Mar. 19, 2020)(discussing the heightened risk presented versus the community at large). Thus, when looking at whether an inmate is at a prison with a high risk of contracting COVID-19, it is also important to recognize the context and failures of the BOP to step the spread of COVID-19 in prisons.

While an initial wave of compassionate release applications properly focused on those inmates who are elderly or have critical health problems, it has not been enough. As has been recognized by policy makers and courts, the urgent and unprecedented national emergency facing our country requires that the prison population be reduced as much as possible, in a manner consistent with public safety. See e.g. Joint Statement from Elected Prosecutors on COVID-19 and Addressing the Rights and

Needs of Those in Custody (Mar. 25 ,2020).[45]

    Memorandum from the Attorney General to the Director of the Bureau of Prisons re:Prioritizing Home Confinement as Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020).[46] It is vital that the BOP - and where it fails to do so, the courts - modify the sentence of other inmates as well. Mr. Hoey, who has served more than 71 percent of his sentence, who poses no threat to the community, is precisely the sort of inmate who merits release, and must be released if the goal of substantially reducing the risk of infection in the prisons and surrounding communities is to be achieved, especially in light of his "out custody" status.

    Mr. Hoey faces another dire situation from the risk of reinfection from COVID-19, especially when FCI Fort Dix has been unsuccessful at mitigating the risk of reinfection, given the high numbers of infected inmates and defendant's own contraction of the virus and evidence is emerging that with these new variants that will dominate the United States, the greatest concern now is the real possibility at "reinfection," so many courts are beginning to "err on the side of caution to avoid potentially lethal consequences" because "the science is unclear on whether reinfection is possible (see United States v. Yellin, 2020 WL 3488738, at *13 (S.D. Cal. June 26, 2020).

---

45 https://fairandjustprosecution.org/wp-content/upload/2020/03/coronavirus-sign-on-letter.pdf. (joint letter issued by District Attorney's offices across the country, arguing that because prisons can "become breeding grounds for coronavirusǁ" it is crucial to "work together to implement concrete steps in the near-term to dramatically reduce the number of incarcerated individuals and the threat of disastrous outbreaks.")

46 https://www.politico.com/f/?id=0000171-1826-d4a1-ad77-fda671420000.

**D.    The Harsh Conditions at FCI Fort Dix Warrant the Granting of Compassionate Release**

Current conditions at FCI Fort Dix are anything but normal. There has been an unprecedented change of circumstances that could not have been foreseen at the time of sentencing. The COVID-19 pandemic, as well as the dangerous conditions for its spread within prisons, now pose an extraordinary and perhaps lethal risk to Mr. Hoey's health. Public health experts unanimously agree that the virus thrives in densely packed populations and is especially aggravated in unsanitary conditions where people are unable to practice social distancing, proper handwashing, and sanitizing.[47] In the short time since reporting its first COVID-19 infection, the BOP has seen an explosion of cases among inmates and staff.

Moreover, Mr. Hoey is unfortunate enough to currently suffer from underlying medical conditions that are known to increase the severity of the virus, the mere fact of his confinement in a correctional institution exacerbates his eventual contraction of COVID-19, resulting in shortness of breath, loss of taste and smell, cognitive impairments, and other symptoms.

These changed circumstances are "extraordinary and compelling" so as to warrant compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) and modification of his original sentence. The changed circumstances also materially alter the balance of the 18 U.S.C. 3553(a) factors which this Court is **to**

---

[47] See Exhibit "C": Declaration of Dr. Jaimie Meyer, MD.

consider anew in the context of an application for compassionate release. While Mr. Hoey's crime remains as serious as the Court deemed it at sentencing, keeping him in prison within conditions that potentially jeopardizes his life is a punishment this Court surely never intended to impose, and is far "greater than necessary" to achieve the purposes of sentencing. See 18 U.S.C. § 3553(a). Pursuant to 18 U.S.C. § 3582(c)(1)(A)(ii), Mr. Hoey is eligible for home confinement and he has a concrete plan for reintgration into society, which includes returning to the home he shared with his wife. Allowing Mr. Hoey to finish out his sentence at home is the most prudent and humane response to the risks created by the novel coronavirus.

Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by courts in measuring the just sentence. See, e.g., United States v. Carty, 264 F.3d 191, 196-97 (2d Cir. 2001)(holding that the "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departure," and vacating and remanding the defendant's sentence "so that the district court could reconsider the defendant's request for a downward departure и and do so in the light of this holding"); United States v. San Pedro и 352 F.App'x 482, 486 (2d Cir. 2009)(noting that "in imposing the sentence it did, the district court considered...[among other factors,] the harsh conditions of [the defendant's] confinement at Combita," in Colombia, where he was detained before being extradited to the

United States); <u>United States v. Salvador</u>, No. 98-cr-484 (LMM),
2006 WL 2034637, at *4 (S.D.N.Y. July 19, 2006)(holding that
defendant's pre-sentence conditions while "incarcerated in the
Dominican republic, awaiting extradition to the United
States...warrant a downward departure"); <u>United States v. Torres</u>,
No. 01-cr-1078 (LMM), 2005 WL 2087818 at *2 (S.D.N.Y. Aug. 30,
2005)("departing downward by 1 level, because of the harsh
conditions of defendant's pre-trial detention").

The same logic applies here. A day in prison under extreme
lockdown and in legitimate fear of contracting a once-in-a-
century deadly virus exacts a price on a prisoner beyond that
imposed by an ordinary day in prison. While such conditions are
not intended as punishment, incarceration in such conditions is,
unavoidably, experienced as more punishing. See <u>United States v.
Rodriguez</u>, No. 00-cr-761-2 (JSR), 2020 WL 5810161, at *3
(S.D.N.Y. Sept. 30, 2020)("The pandemic, aside from posing a
threat to [a defendant's] health, has made [a defendant's]
incarceration harsher and more punitive than would otherwise have
been the case. This is because the federal prisons, as 'prime
candidates' for the spread of the virus, have had to impose
onerous lockdowns and restrictions that have made the
incarceration of prisoners far harsher than normal."); <u>United
States v. Salemo</u> No. 11-cr-0065-01 (JSR), 2020 WL 252155, at *3
(S.D.N.Y. May 17, 2020)("noting that the BOP has taken a number
of steps to mitigate the spread of the virus in federal
prisons...[including] restrictions on visitors, restrictions on

gatherings...and lockdowns lasting at least 14 days"); <u>United States v. Smalls</u>, No. 20-cr-126 (LTS), 2020 WL 1866034, at *2 (S.D.N.Y. Apr. 14, 2020)(noting that the "BOP has instituted a mandatory 14 quarantine lockdown of all inmates across the BOP system") Here, the eleven months in which Mr. Hoey has spent in prison during COVID-19 offsets the need for him, in order to assure just pusnishment.

To be sure, the circumstances commonly invoked during the pandemic to justify release under § 3582 - the defendant's heightened vulnerability to COVID_19, relevant to the factors of the "history and characteristics of the defendant" and "the need to provide the defendant with needed...medical care," see 18 U.S.C. § 3553(a)(1), (2)(D) - are present here, because Mr. Hoey does have such conditions. Nevertheless, since March 2020, there has been an outsized risk, even for a medically ordinary prisoner, that the COVID-19 contagion, once it gains entry into the crowded environment of a prison, will spread. Although Mr. Hoey can claim heightened vulnerability to COVID-19, his claim during the past eleven months to have experienced heightened deprivation - and to have experienced unexpectedly punishing prison conditions - is credible, as well as does the substantial risk that his novel coronavirus poses to Mr. Hoey as a significant outbreak of the virus spreads out-of-control throughout FCI Fort Dix that has so far infected over a thousand inmates and dozens of staff.

E.    New CDC's Guidance and DOJ's Major Policy Change
Concerning Inmates With Comorbities that Present
"Extraordinary and Compelling Reasons" to be
Considered for Compassionate Release

On October 6, 2020, the CDC revised its guidance. Then, on November 2, 2020, to reflect the most recently available date, the CDC again revised its guidance as to medical conditions that pose a greater risk of illness due to COVID-19. According to the CDC, the factors that increase the risk include cancer, chronic kidney disease; COPD; being immuno-compromised; obesity, where the BMI is 30 or higher; serious heart conditions[] including heart failure and coronary artery disease; sickle cell disease; and type II diabetes.[48]

The CDC has also created a second category for conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include cerebravascular disease[] hypertension, pregnancy, liver disease, cystic fibrosis[] neurologic conditions, a compromised immune system, smoking, and Type I diabetes. See, Id. And the CDC cautions that the "more underlying conditions someone has, the greater their risk is for severe illness from COVID-19."[49]

Further[] the Department of Justice in May of 2020, has take the position that inmates who suffer from a condition identified as putting them at a higher risk for contracting severe illness from COVID-19 and who are not expected to recover from that

---

[48] See "People With Certain Medical Conditions[]" CDC, Nov. 2, 2020, at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

[49] Id.

condition, present an "extraordinary and compelling reason" to be considered for compassionate release.

In _Wise v. United States_, No. 1:18-cr-72, 2020 WL 2614816 (D. Md. May 22, 2020), the Government's filing at ECF 185 is that case had explained, in pertinent part:

> The Government writes to amend its response to the defendant's motion for compassionate release and sentence modification, ECF 180. Since filing its response on May 11, 2020, undersigned's counsel has been informed that the Department of Justice has taken the position that inmates who suffer from a condition identified by the Centers for Disease Control and Preventions ("CDC") as putting them at higher risk for severe illness from COVID-19 and who are not expected to recover from that condition, present an "extraordinary and compelling reasons" to be considered for compassionate release - even if that condition in ordinary times would not meet the terms of the policy statement. See U.S.S.G. § 1B1.13 cmt. n. 1(A)(ii)(1).[50]

This policy change constitutes a major change; one that - hopefully for the courts and mercifully to defendants - will largely eliminate the need for fact-intense inquiries into whether a defendant's particular chronic condition will, in light of conditions at the defendant's particular place of incarceration, will hold that Mr. Hoey's pre-existing health conditions in combination with the increased risks of contracting COVID-19 in prisons constitutes "extraordinary and compelling reasons" warranting relief.

---

50 Government's Response in _Wise v. United States_, ECF 185, hereto attached as Exhibit "E"

### III. HEALTH CONDITIONS

Mr. Hoey is a 52 year old inmate who suffers from hypertension and sleep apnea,[51] and each of Mr. Hoey's comorbities, places him at a very high risk of severe illness or death should he become reinfected with COVID-19. His fears of contracting this virus at this prison is not speculative - this prison is currently experiencing a profound outbreak of COVID-19 that has infected over fifteen hundred inmates and dozens of staff, within the Unit that Mr. Hoey is assigned to a unit on lockdown, and previously under quarantine because a significant number of inmates tested positive for COVID-19, and these inmates are not receiving any medical treatment, nor medications that might relieve some of the symptoms of this virus.

The situation at FCI Fort Dix is dire. This is a prison that went from no cases to over a thousand within a matter of weeks.

### 1. Hypertension

Mr. Hoey has hypertension (or high blood pressure). The CDC tells us that hypertension "might" put a person "at an increased risk for severe illness from COVID-19."[52] Indeed, it does. One study tells the tale: No fewer than 94 percent of persons

---

51 Mr. Hoey has been diligently attempting to obtain his BOP medical records, but has been unable to obtain them, even after multiple requests.

52 "People With Certain Medical Conditions," CDC Online, supra at 5 n. 11

hospitalized for COVID-19 suffer at least one chronic underlying condition and among those, "hypertension was common."[53] While the "relationship between hypertension and severe illness from COVID-19 is one battleground in this unsettled and rapidly evolving area of scientific research, "it is undisputed that "hypertension is one of the most common comorbities in people who experience severe cases of COVID-19." United States v. Salvagno, No. 5:02-cr-51, 2020 WL 3410601, at *12 (N.D.N.Y. June 22, 2020). In Salvagno, after the Court granted the defendant's motion for compassionate release, the United States filed a motion for reconsideration. Id. at 1, 7. In its denial of the government's motion for reconsideration, the Court thoroughly evaluated the relationship between hypertension as a risk factor and COVID-19. Id. at 12-17. The Court found that while "the unsettled nature of the science surrounding risk factors" of COVID-19 make the establishment of "hypertension as a cause of severe illness from COVID-19 "a difficult task, Id. at 13 "several peer-reviewed scientific studies and research commentaries in reputable scientific journals conclude that hypertension is independently associated with severe manifestations of COVID-19, controlling for the confounding variables of age and other health conditions." Id. at 15. The scientific authorities "indicate an

---

[53] Roni Caryn Robin, "Nearly All Patients Hospitalized With COVID-19 Had Chronic Health Issues, Study Finds," New York Times (Apr. 25, 2020), available at: https://www.nytimes.com/2020/04/23/health/coronavirus-patients-risk.html

association between 'hypertension' broadly, and severe illness and death from COVID-19," not an association that varies in risk based on the severity of the defendant's hypertension." Id. at 16.

## 2. Sleep Apnea

Three studies reported that obstruction sleep apnea (OSA) maybe a potential risk factor for severe COVID-19, OSA is a sleep disorder characterized by repetitive upper-hypophea cycles during sleep, which causes shortness of breath and can often lead to sleep disruption, severe oxygen desaturation, and an increased systolic and diastolic blood pressure.[54]

The common risk factors for OSA are older age, obesity, male sex, and upper-airway structure anomalies. Since OSA affects nearly 8% of the population and has a higher prevalence of over 20% in individuals above 60 years, its association with the risk of severe COVID-19 infection leading to hospitalizations is worrying.[55]

Research teams from the University of Helsinki; Helsinki University Hospital; Broad Institute of MIT and Harvard; and Massachusetts General Hospital; Boston, MA, decided to build on these studies and test the link between OSA and COVID-19

---

[54] Sta Strausz, et al., "Sleep Apnea is a Risk Factor for Severe COVID-19," MedRxiv (Sept. 26, 2020) at: https://www.Medrxiv/content/10.1101/2020.09.26.20202005/v2

[55] Id.

using large-scale biobank with health data of patients.[56] The results of this study showed that OSA patients with COVID-19 were a 5 times more at risk of developing complications and being hospitalized.

OSA is an independent risk factor for severe COVID-19 that requires hospitalization. It educated the risk regardless of age, sex, hypertension, body mass index, diabetes, asthma, and chronic obstructive pulmonary disease, and coronary heart diseaes.[57]

Based on the analysis done in the study, the researchers conducted that OSA patients have a 5-fold risk of being hospitalized when they have a COVID-19 infection compared to individuals without OSA.[58]

The finding suggests that during the assessment of suspected or confirmed COVID-19 patients, OSA should be considered a comorbity risk factor for developing a severe form of COVID-19. These findings agree with previous reports that suggested a connection between OSA and severe COVID-19 risks because they share many risk factors and comorbities.[59]

---

[56] Susha Cheriyedath, "Sleep Apnea Increases Risk of Severe COVID-19" (Sept. 29, 2020) at: www.news-medical.net/amp/news/20200929/sleep-apnea-increases-risk-of-severe-covid19.html

[57] Id.

[58] Id.

[59] Id.

## IV. ARGUMENT AND CITATION AUTHORITY

Congress enacted the modern form of the compassionate release statute, 18 U.S.C. 3582(c)(1)(A), as part of the Comprehensive Crime Control Act of 1984 – it created a mechanism for district courts to reduce a defendant's sentence for "extraordinary and compelling reasons."[60] The law appointed the Director of the BOP as the lone gatekeeper, only he or she was empowered to file a motion for compassionate release. In 2018, the First Step Act modified this procedure to "increase the use and transparency of compassionate release."[61] In this statute, Congress enabled a defendant (with or without BOP approval) to invoke § 3582(c)(1)(A) and to move the sentencing court for a compassionate release sentence reduction. A district court may now – with or without the BOP's blessing – resentence a defendant if he files a motion and establishes "extraordinary and compelling reasons" for a sentence reduction.

1. **Under the New Version of § 3582(c)(1)(A), this Court has Jurisdiction to Grant Mr. Hoey Compassionate Release**

The BOP still has a role to play in this drama. The law expects a defendant to file an administrative request for compassionate release with the Warden. The law also prefers them to wait 30 days before filing a formal motion in the sentencing

---

60 See "Comprehensive Crime Control Act of 1984," Pub.L. No. 98-473, ch. II(D) § 3582(c)(1)(A), 98 Stat. 1837 (1984).

61 First Step Act of 2018, Pub.L.No. 115-391, §603, 132 Stat. 5194 (Dec. 21, 2018).

court. The newly revised statute reads in part:

> The court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment...[62]

Mr. Hoey has filed an admistrative request[63] to the Warden for reduction in sentence based on his medical condition and the coronavirus threat. On December 11, 2020, Warden's office responded with neither an approval or denial, but a request for more information.[64] Providing more information would have been futile. This is because the document sent by the Warden contained incomplete information for the lawful basis for Compassionate Release. Rather than relying on the provisions cited in the Warden's response, U.S.S.G. § 1B1.13, Application Notes (A)-(C), Mr. Hoey's request relied on the so-called "catch-all" provision of the U.S. Sentencing Commission's criteria for compassionate release, pursuant to U.S.S.G. § 1B1.13, Application Note 1(D). Thus he argues that the Warden's response contained outdated and limited criteria of eligibility for compassionate release and routed him down a rabbit hole to nowhere. He was essentially forced into a circular position in which no adequate relief could be granted, despite his increased risk of severe illness from COVID-19.

---

62 18 U.S.C. § 3582(c)(1)(A)

63 See Exhibit "F": Mr. Hoey's compassionate release request.

64 See Exhibit "G": Warden's response.

2.   Mr. Hoey Demonstrates "Extraordinary and Compelling Reasons" under § 3582(c)(1)(A) for a Reduction in Sentence.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), provides a court may reduce a defendant's term of imprisonment after consideration of the factors set forth in § 3553(a) if it finds "extraordinary and compelling reasons" and such a reduction is "consistent with the applicable policy statements issued by the Sentencing Commission." Mr. Hoey merits compassionate release due to the serious if he contracts COVID-19, and the failure of the BOP that allowed this deadly virus to invade Fort Dix.


A.   What Does "Extraordinary and Compelling Reason" Mean?

An "extraordinary and compelling reason" is in the eye of the beholder. It is a reason that the sentencing court says is substantial enough, and urgent enough, to merit compassionate release. When Congress penned the law 35 years ago, it delegated the task of defining what "constitutes extraordinary and compelling reasons" to the United States Sentencing Commission.[65] In response, the Commission produced U.S.S.G. § 1B1.13. An application note to the guideline provides three categories of "extraordinary and compelling reasons" and a fourth catchall

---

[65] See 28 U.S.C. §994(t)("the Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentencing reduction...")

provision:

> (D)    Other Reasons – As determined by the Director of
> the Bureau of Prisons, there exists in the
> defendant's case an extraordinary and compelling
> reason other than, or in combination with, the
> reasons described in subdivision (A) through
> (C).

After the First Step Act, these guidelines are merely
suggestive, not rules. Courts have recently recognized that while
the Commission's policy statements provide helpful guidance, they
do not constrain a court's independent assessment of whether
"extraordinary and compelling reasons" exist to warrant a
sentence reduction under 3582(c)(1)(A).[66]

> Recently, the Second Circuit held:
> The First Step Act freed district courts to consider
> the full slate of extraordinary and compelling
> reasons that an imprisoned person might bring before
> them in motions for compassionate release. Neither
> Application Note 1(D), nor anything else in the now-
> outdated version of guideline § 1B1.13, limits the
> district court's discretion.

United States v. Zullo, F.3d (2d Cir. Sept. 25, 2020), 19-
3218-cr at 18. In light of the circumstances described above, the
Court should join other courts in the Southern District and deem
the dire threat posed by the coronavirus to Mr. Hoey, especially
as the virus continues to take hold at FCI Fort Dix, to be
"extraordinary and compelling" under 18 U.S.C. §
3582(c)(1)(A)(i).

----

[66] See United States v. Beck, 2019 WL 2716505, at *6 (M.D.N.C.
June 28, 2019). This is so because the Commission's statutory
authority is limited to explaining "the appropriate U.S. at
§3582 under the current statute." United States v. Cantu, 2019
WL 2498923, at *3 (S.D. Tex. June 17, 2019). An amendment to
2582, including the Compassionate release section, "may
[therefore] cause some provisions of a policy statement to no
longer fall under that authority." Id.

3.  **A reduced sentence of time served is sufficient, but not greater than necessary to meet the 18 U.S.C. § 3553(a) sentencing factors**

Federal courts all over the country, and in this district have granted compassionate release motions (and immediate release) to vulnerable inmates imperiled by the COVID-19 epidemic. The Court ought to do the same here. A failure to do so would also create unwarranted disparities with other similarly situated federal prisons. Mr. Hoey's medical conditions place him in a category of individuals for whom compassionate release is not only appropriate, but necessary to ensure his survival. Therefore, the inquiry turns to the statutory factors found in 18 U.S.C. § 3553(a) should guide this Court's discretion in determining whether to grant release to Mr. Hoey. Here those factors support compassionate release.

At the time of Mr. Hoey's sentencing, the significant length of the sentence fairly reflected the seriousness of the offense committed. Now, this defendant prays that the Court will find that the sentencing factors weigh in his favor at this point in time. This is not an attempt to downplay the severity of the crime for which he was sentenced. But at the time of sentencing, the Court was not aware of the seriousness of the harsh conditions of defendant's confinement, coupled with the fact that the Court further "did not intend for the sentence to include incurring a great and unforeseen risk of severe illness or death brought on by a global pandemic." United States v. Zukeman 2020 WL 1659880, at *6 (S.D.N.Y. Apr. 3, 2020)(quoting United States

v. Rodriguez, 2020 WL 1627331, at *12 (E.D. Pa. Apr. 1, 2020); cf, United States v. Asaro, 2020 WL 189921, at *8 (E.D.N.Y. Apr. 17, 2020)("At sentencing, I intended to impore on the above Guideline sentence - not a death sentence ... I do not believe that continued detention, in the risk of serious illness or death from COVID-19 is an appropriate or proportionate way to further the purpose of sentencing.")

## V. THE COURT'S MERCY

This Court is in the business of weighing equities to make consequential decision, yet, other than habeas corpus proceedings in death penalty cases, few prior cases could have presented the potential, if not likely, life-or-death consequences that this case presents. The Court should grant this motion because so rarely do justice and mercy require the same result. See Walker v. Martel, 709 F.3d 925, 950-51 (9th. Cir. 2013)(Gould, J., concurring in part & dissenting in part)("Shakespeare told us that 'the quality of mercy is not strained,' Milton instructed us to 'temper so justice with mercy' and advised us that 'mercy must colleague with justice'' and President Lincoln reminded us that 'mercy bears richer fruit than strict justice.'")(citations omitted); the Torah, Micah 6:8 ("what does the Lord require of you but to do justice, and to love kindness, and to walk humbly with your God.")

As previously mentioned, there are no long-term survivors of this wholly new disease. Even its first victims in China are

little less than a year removed from their ordeal. Much is still unknown about this virus and how it effectively attacks the body - research the Dr. Fauci described as "a work in progress.[67]

## CONCLUSION

A district court is "to sentence the defendant as he stands before the court on the day of sentencing." See United States v. Bryson, 229 F.3d 425, 426 (2d Cir. 2000). Meanwhile, "by now, the five largest known clusters of the virus in the United States are not at nursing homes or meat packing plants, but inside correctional institutions."[68] Mr. Hoey asks the Court to grant this motion, to reduce his sentence to time served and allow him to seek the medical treatment that he immediately requires if he is to stay alive, and other relief that the Court may deem just and proper.[69]

Dated this 8th day of February, 2021.

Respectfully Submitted,

Thomas Hoey
Reg. No. 92147-054
FCI Fort Dix.
P.O. Box 2000
Joint Base MDL, NJ 08640

67 Denise Grady, "Fauci Warns That The Coronavirus Pandemic Is Far From Over," New York Times (Jun. 9, 2020) at https://www.nytimes.com/20202/06/09/health/fauci-vaccines-coronavirus.html

68 "Coronavirus Cases Rise Sharply In Prisons Even As They Plateau Nationwide," NY Times Online, at: www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html.

69 Exhibit "H": Mr. Hoey's letter addressed to the Court with detailed release plans if granted compassionate release.

# Exhibit A

```
   FTDCG  540*23 *            SENTENCE MONITORING        *     01-10-2021
   PAGE 001        *          COMPUTATION DATA           *     15:10:50
                              AS OF 01-10-2021
```

REGNO..: 92147-054 NAME: HOEY, THOMAS JR


```
FBI NO...........: 201765PD1        DATE OF BIRTH: 03-07-1968  AGE:  52
ARS1.............: FTD/A-DES
UNIT.............: UNIT 5702         QUARTERS.....: A03-154L
DETAINERS........: NO                NOTIFICATIONS: NO
```

HOME DETENTION ELIGIBILITY DATE: 06-25-2023

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  12-25-2023 VIA GCT REL


---------------------CURRENT JUDGMENT/WARRANT NO: 010 -----------------------

```
COURT OF JURISDICTION..........: NEW YORK, SOUTHERN DISTRICT
DOCKET NUMBER..................: 1:S6 11 CR 00337-003
JUDGE..........................: CASTEL
DATE SENTENCED/PROBATION IMPOSED: 04-23-2015
DATE COMMITTED.................: 08-18-2016
HOW COMMITTED..................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED..............: NO
```

```
                   FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.:    $300.00        $00.00          $00.00       $00.00
```

RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO      AMOUNT:  $00.00

 REMARKS.......: 1: S6 11 CR 00337-003(PKC)

-----------------------CURRENT OBLIGATION NO: 010 ---------------------------
```
OFFENSE CODE....: 153     18:286,371 FRAUD, OTHER
OFF/CHG: 18:371 CONSPIRACY & POSSESS W/INTENT TO DISTRIBUTE COCAINE CT1
         18:1622 CONSPIRING TO SUBORN PERJURY CT2; 18:1503 & 2
         OBSTRUCTION OF JUSTICE CT3.
```

```
SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
SENTENCE IMPOSED/TIME TO SERVE.:   141 MONTHS
TERM OF SUPERVISION............:     3 YEARS
RELATIONSHIP OF THIS OBLIGATION
 TO OTHERS FOR THE OFFENDER....: CS TO OBLG 020
DATE OF OFFENSE................: 12-31-2010
```


G0002      MORE PAGES TO FOLLOW . . .

```
FTDCG  540*23 *            SENTENCE MONITORING        *     01-10-2021
PAGE 002        *            COMPUTATION DATA          *     15:10:50
                              AS OF 01-10-2021
```

REGNO..: 92147-054 NAME: HOEY, THOMAS JR


---------------------------CURRENT JUDGMENT/WARRANT NO: 020 ------------------------

```
COURT OF JURISDICTION...........: NEW YORK, SOUTHERN DISTRICT
DOCKET NUMBER...................: 15-CR-229 (PAE)
JUDGE...........................: ENGELMAYER
DATE SENTENCED/PROBATION IMPOSED: 07-25-2016
DATE COMMITTED..................: 08-18-2016
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO
```

```
                  FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.:   $400.00        $00.00          $00.00       $00.00
```

RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO        AMOUNT:  $650,936.20

--------------------------CURRENT OBLIGATION NO: 010 -----------------------------

```
OFFENSE CODE....:  103    18:664 EMBEZZLE BENEFIT PLAN
OFF/CHG: 18:664  EMBEZZLEMENT FROM AN EMPLOYEE BENEFIT PLAN 18:2314
         INTERSTATE TRANSPORTATION OF STOLEN MONEY.18:1343 WIRE FRAUD
         18:1957 MONEY LAUNDERING
```

```
 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:    84 MONTHS
 TERM OF SUPERVISION............:     3 YEARS
 RELATIONSHIP OF THIS OBLIGATION
  TO OTHERS FOR THE OFFENDER....: CC & CS TO 010
 DATE OF OFFENSE................: 12-19-2013
```

G0002        MORE PAGES TO FOLLOW . . .

```
   FTDCG  540*23 *              SENTENCE MONITORING          *    01-10-2021
PAGE 003 OF 003 *               COMPUTATION DATA             *    15:10:50
                                AS OF 01-10-2021

REGNO..: 92147-054 NAME: HOEY, THOMAS JR


------------------------CURRENT COMPUTATION NO: 010 --------------------------

COMPUTATION 010 WAS LAST UPDATED ON 02-25-2020 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 11-15-2018 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010, 020 010

DATE COMPUTATION BEGAN..........: 04-23-2015
AGGREGATED SENTENCE PROCEDURE...: AGGREGATE GROUP 800 PLRA
TOTAL TERM IN EFFECT............:  141 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:   11 YEARS       9 MONTHS
AGGREGATED TERM OF SUPERVISION..:    3 YEARS
EARLIEST DATE OF OFFENSE........: 12-31-2010

JAIL CREDIT.....................:    FROM DATE     THRU DATE
                                    12-19-2013    04-22-2015


TOTAL PRIOR CREDIT TIME.........: 490
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 634
TOTAL GCT EARNED................: 378
STATUTORY RELEASE DATE PROJECTED: 12-25-2023
ELDERLY OFFENDER TWO THIRDS DATE: 10-20-2021
EXPIRATION FULL TERM DATE.......: 09-19-2025
TIME SERVED.....................:    7 YEARS      23 DAYS
PERCENTAGE OF FULL TERM SERVED..: 60.0
PERCENT OF STATUTORY TERM SERVED: 70.5

PROJECTED SATISFACTION DATE.....: 12-25-2023
PROJECTED SATISFACTION METHOD...: GCT REL

REMARKS.......: 08-29-16 COMP ENTERED JEE/D.
                05-25-17 AMENDED JUDGMENT,FINE REMOVED JEE/D.
                11-05-18 RESENTENCED,NEW TIE D/CMT. 11-15-18 ADD JL CRED D/CMT
                02-25-20: UPD FOR FSA/GCT D/LLF




G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

# Exhibit B

Declaration for Persons in Detention and Detention Staff
COVID-19

Chris Beyrer, MD, MPH
Professor of Epidemiology
Johns Hopkins Bloomberg School of Public Health
Baltimore, MD

I, Chris Beyrer, declare as follows:

1. I am a professor of Epidemiology, International Health, and Medicine at the Johns Hopkins Bloomberg School of Public Health, where I regularly teach courses in the epidemiology of infectious diseases. This coming semester, I am teaching a course on emerging infections. I am a member of the National Academy of Medicine, a former President of the International AIDS Society, and a past winner of the Lowell E. Bellin Award for Excellence in Preventive Medicine and Community Health. I have been active in infectious diseases Epidemiology since completing my training in Preventive Medicine and Public Health at Johns Hopkins in 1992.

2. I am currently actively at work on the COVID-19 pandemic in the United States. Among other activities I am the Director of the Center for Public Health and Human Rights at Johns Hopkins, which is active in disease prevention and health promotion among vulnerable populations, including prisoners and detainees, in the US, Africa, Asia, and Latin America.

### The nature of COVID-19

3. The SARS-nCoV-2 virus, and the human infection it causes, COVID-19 disease, is a global pandemic and has been termed a global health emergency by the WHO. Cases first began appearing sometime between December 1, 2019 and December 31, 2019 in Hubei Province, China. Most of these cases were associated with a wet seafood market in Wuhan City.

4. On January 7, 2020, the virus was isolated. The virus was analyzed and discovered to be a coronavirus closely related to the SARS coronavirus which caused the 2002-2003 SARS epidemic.

5. COVID-19 is a serious disease. The overall case fatality rate has been estimated to range from 0.3 to 3.5%, which is 5-35 times the fatality associated with influenza infection. COVID-19 is characterized by a flu-like illness. While more than 80% of cases are self-limited and generally mild, overall some 20% of cases will have more severe disease requiring medical intervention and support.

6. The case fatality rate varies significantly depending on the presence of certain demographic and health factors. The case fatality rate is higher in men, and varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with pre-existing medical conditions including cardio-vascular disease, respiratory disease, diabetes, and immune compromise.

7. Among patients who have more serious disease, some 30% will progress to Acute Respiratory Distress Syndrome (ARDS) which has a 30% mortality rate overall, higher in those with other health conditions. Some 13% of these patients will require mechanical

EXHIBIT
_____

ventilation, which is why intensive care beds and ventilators have been in insufficient supply in Italy, Iran, and parts of China.

8. COVID-19 is widespread. Since it first appeared in Hubei Province, China, in late 2019, outbreaks have subsequently occurred in more than 100 countries and all continents, heavily affected countries include Italy, Spain, Iran, South Korea, and increasingly, the US.  As of today, March 16th, 2020, there have been 178,508 confirmed human cases globally, 7,055 known deaths, and some 78,000 persons have recovered from the infection.  The pandemic has been termed a global health emergency by the WHO. It is not contained and cases are growing exponentially.

9. SARS-nCoV-2 is now known to be fully adapted to human to human spread.  This is almost certainly a new human infection, which also means that there is no pre-existing or "herd" immunity, allowing for very rapid chains of transmission once the virus is circulating in communities.

10. The U.S. CDC estimates that the reproduction rate of the virus, the $R_0$, is 2.4-3.8, meaning that each newly infected person is estimated to infect on average 3 additional persons. This is highly infectious and only the great influenza pandemic of 1918 (the Spanish Flu as it was then known) is thought to have higher infectivity.  This again, is likely a function of all human populations currently being highly susceptible.  The attack rate given an exposure is also high, estimated at 20-30% depending on community conditions, but may be as high as 80% in some settings and populations.  The incubation period is thought to be 2-14 days, which is why isolation is generally limited to 14 days.

### The risks of COVID-19 in detention facilities

11. COVID-19 poses a serious risk to inmates and workers in detention facilities. Detention Facilities, including jails, prisons, and other closed settings, have long been known to be associated with high transmission probabilities for infectious diseases, including tuberculosis, multi-drug resistant tuberculosis, MRSA (methicillin resistant staph aureus), and viral hepatitis.

12. The severe epidemic of Tuberculosis in prisons in Central Asia and Eastern Europe was demonstrated to increase community rates of Tuberculosis in multiple states in that region, underscoring the risks prison outbreaks can lead to for the communities from which inmates derive.

13. Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus, are particularly difficult to control in detention facilities, as 6-foot distancing and proper decontamination of surfaces is virtually impossible. For example, several deaths were reported in the US in immigration detention facilities associated with ARDS following influenza A, including a 16-year old male immigrant child who died of untreated ARDS in custody in May, 2019.

14. A number of features of these facilities can heighten risks for exposure, acquisition, transmission, and clinical complications of these infectious diseases. These include physical/mechanical risks such as overcrowding, population density in close confinement, insufficient ventilation, shared toilet, shower, and eating environments and limits on hygiene and personal protective equipment such as masks and gloves in some facilities.

15. Additionally, the high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure.  This has led to prison outbreaks of COVID-19 in multiple detention facilities in China, associated with introduction into facilities by staff.

16. In addition to the nature of the prison environment, prison and jail populations are also at additional risk, due to high rates of chronic health conditions, substance use, mental health issues, and, particularly in prisons, aging and chronically ill populations who may be vulnerable to more severe illnesses after infection, and to death.

17. While every effort should be made to reduce exposure in detention facilities, this may be extremely difficult to achieve and sustain. It is therefore an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible.

18. Pre-trial detention should be considered only in genuine cases of security concerns. Persons held for non-payment of fees and fines, or because of insufficient funds to pay bail, should be prioritized for release. Immigrants awaiting decisions on their removal cases who are not a flight risk can be monitored in the community and should be released from immigration detention centers. Older inmates and those with chronic conditions predisposing to severe COVID-19 disease (heart disease, lung disease, diabetes, immune-compromise) should be considered for release.

19. Given the experience in China as well as the literature on infectious diseases in jail, an outbreak of COVID-19 among the U.S. jail and prison population is likely. Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of March, 2020.

_____
Professor Chris Beyrer[1]

_____
[1] These views are mine alone; I do not speak for Johns Hopkins University or any department therein.

**References**

Stuckler D,  Basu S, McKee M, King I.  Mass incarceration can explain population increases in TB and multi-drug resistant TB in European and Central Asian countries.  Proceedings of the National Academy of Science USA, 2008. 105:13280-85.

Beyrer C, Kamarulzaman A, McKee M; Lancet HIV in Prisoners Group. Prisoners, prisons, and HIV: time for reform. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30829-7. doi: 10.1016/S0140-6736(16)30829-7. [Epub ahead of print] No abstract available.
PMID: 27427447.

Marusshak LM, Sabol W, Potter R, Reid L, Cramer E.   Pandemic Influenza and Jail Facilities and Populations.  American Journal of Public Health.  2009 October; 99(Suppl 2): S339–S344.

Rubenstein LS, Amon JJ, McLemore M, Eba P, Dolan K, Lines R, Beyrer C. HIV, prisoners, and human rights. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30663-8. doi: 10.1016/S0140-6736(16)30663-8

Wang J, Ng, CY, Brook R.  Response to COVID-19 in Taiwan:  Big Data Analytics, New Technology, and Proactive Testing. March 3, 2020.  *JAMA.* Published online March 3, 2020. doi:10.1001/jama.2020.3151

# Exhibit C

Case 1:15-cr-00229-PAE   Document 138   Filed 03/01/21   Page 53 of 86
Case 3:09-cr-00018-NKM   Document 278-3   Filed 03/24/20   Page 1 of 23   Pageid#: 820
Case 1:20-cv-01803-AKH   Document 42   Filed 03/16/20   Page 1 of 23

## Declaration of Dr. Jaimie Meyer

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

### I.   Background and Qualifications

1. I am Dr. Jaimie Meyer, an Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven, Connecticut. I am board certified in Internal Medicine, Infectious Diseases and Addiction Medicine.  I completed my residency in Internal Medicine at NY Presbyterian Hospital at Columbia, New York, in 2008. I completed a fellowship in clinical Infectious Diseases at Yale School of Medicine in 2011 and a fellowship in Interdisciplinary HIV Prevention at the Center for Interdisciplinary Research on AIDS in 2012. I hold a Master of Science in Biostatistics and Epidemiology from Yale School of Public Health.

2. I have worked for over a decade on infectious diseases in the context of jails and prisons. From 2008-2016, I served as the Infectious Disease physician for York Correctional Institution in Niantic, Connecticut, which is the only state jail and prison for women in Connecticut.  In that capacity, I was responsible for the management of HIV, Hepatitis C, tuberculosis, and other infectious diseases in the facility.  Since then, I have maintained a dedicated HIV clinic in the community for patients returning home from prison and jail. For over a decade, I have been continuously funded by the NIH, industry, and foundations for clinical research on HIV prevention and treatment for people involved in the criminal justice system, including those incarcerated in closed settings (jails and prisons) and in the community under supervision (probation and parole).  I have served as an expert consultant on infectious diseases and women's health in jails and prisons for the UN Office on Drugs and Crimes, the Federal Bureau of Prisons, and others.  I also served as an expert health witness for the US Commission on Civil Rights Special Briefing on Women in Prison.

3. I have written and published extensively on the topics of infectious diseases among people involved in the criminal justice system including book chapters and articles in leading peer-reviewed journals (including Lancet HIV, JAMA Internal Medicine, American Journal of Public Health, International Journal of Drug Policy) on issues of prevention, diagnosis, and management of HIV, Hepatitis C, and other infectious diseases among people involved in the criminal justice system.

4. My C.V. includes a full list of my honors, experience, and publications, and it is attached as Exhibit A.

5. I am being paid $1,000 for my time reviewing materials and preparing this report.

6. I have not testified as an expert at trial or by deposition in the past four years.

### II.   Heightened Risk of Epidemics in Jails and Prisons

EXHIBIT

1

Case 1:15-cr-00229-PAE   Document 138   Filed 03/01/21   Page 54 of 86
Case 3:09-cr-00018-NKM   Document 278-3   Filed 03/24/20   Page 3 of 23   Pageid#: 821
Case 1:20-cv-01803-AKH   Document 42   Filed 03/16/20   Page 2 of 29

7. The risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected. There are several reasons this is the case, as delineated further below.

8. Globally, outbreaks of contagious diseases are all too common in closed detention settings and are more common than in the community at large. Prisons and jails are not isolated from communities. Staff, visitors, contractors, and vendors pass between communities and facilities and can bring infectious diseases into facilities. Moreover, rapid turnover of jail and prison populations means that people often cycle between facilities and communities. People often need to be transported to and from facilities to attend court and move between facilities. Prison health is public health.

9. Reduced prevention opportunities: Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater. When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.

10. Disciplinary segregation or solitary confinement is not an effective disease containment strategy. Beyond the known detrimental mental health effects of solitary confinement, isolation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death. Isolation of people who are ill using solitary confinement also is an ineffective way to prevent transmission of the virus through droplets to others because, except in specialized negative pressure rooms (rarely in medical units if available at all), air continues to flow outward from rooms to the rest of the facility. Risk of exposure is thus increased to other people in prison and staff.

11. Reduced prevention opportunities: During an infectious disease outbreak, people can protect themselves by washing hands. Jails and prisons do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers when handwashing is unavailable. Jails and prisons are often under-resourced and ill-equipped with sufficient hand soap and alcohol-based sanitizers for people detained in and working in these settings. High-touch surfaces (doorknobs, light switches, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this is often not done in jails and prisons because of a lack of cleaning supplies and lack of people available to perform necessary cleaning procedures.

12. Reduced prevention opportunities: During an infectious disease outbreak, a containment strategy requires people who are ill with symptoms to be isolated and that caregivers have

2

Case 1:15-cr-00229-PAE   Document 138   Filed 03/01/21   Page 55 of 86
Case 3:09-cr-00018-NKM   Document 278-3   Filed 03/24/20   Page 3 of 23   Pageid#: 822
Case 1:20-cv-01803-AKH   Document 42   Filed 03/16/20   Page 3 of 23

access to personal protective equipment, including gloves, masks, gowns, and eye shields. Jails and prisons are often under-resourced and ill-equipped to provide sufficient personal protective equipment for people who are incarcerated and caregiving staff, increasing the risk for everyone in the facility of a widespread outbreak.

13. <u>Increased susceptibility</u>: People incarcerated in jails and prisons are more susceptible to acquiring and experiencing complications from infectious diseases than the population in the community.[1] This is because people in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and lower immune systems from HIV.

14. <u>Jails and prisons are often poorly equipped to diagnose and manage infectious disease outbreaks.</u> Some jails and prisons lack onsite medical facilities or 24-hour medical care. The medical facilities at jails and prisons are almost never sufficiently equipped to handle large outbreaks of infectious diseases. To prevent transmission of droplet-borne infectious diseases, people who are infected and ill need to be isolated in specialized airborne negative pressure rooms. Most jails and prisons have few negative pressure rooms if any, and these may be already in use by people with other conditions (including tuberculosis or influenza). Resources will become exhausted rapidly and any beds available will soon be at capacity. This makes both containing the illness and caring for those who have become infected much more difficult.

15. <u>Jails and prisons lack access to vital community resources to diagnose and manage infectious diseases.</u> Jails and prisons do not have access to community health resources that can be crucial in identifying and managing widespread outbreaks of infectious diseases. This includes access to testing equipment, laboratories, and medications.

16. <u>Jails and prisons often need to rely on outside facilities (hospitals, emergency departments) to provide intensive medical care</u> given that the level of care they can provide in the facility itself is typically relatively limited. During an epidemic, this will not be possible, as those outside facilities will likely be at or over capacity themselves.

17. <u>Health safety:</u> As an outbreak spreads through jails, prisons, and communities, medical personnel become sick and do not show up to work. Absenteeism means that facilities can become dangerously understaffed with healthcare providers. This increases a number of risks and can dramatically reduce the level of care provided. As health systems inside facilities are taxed, people with chronic underlying physical and mental health conditions and serious medical needs may not be able to receive the care they need for these conditions. As supply chains become disrupted during a global pandemic, the availability of medicines and food may be limited.

18. <u>Safety and security:</u> As an outbreak spreads through jails, prisons, and communities, correctional officers and other security personnel become sick and do not show up to

---

[1] *Active case finding for communicable diseases in prisons,* 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(18)31251-0/fulltext.

Case 1:15-cr-00229-PAE   Document 138   Filed 03/01/21   Page 56 of 86
Case 3:09-cr-00018-NKM   Document 278-3   Filed 03/24/20   Page 6 of 23   Pageid#: 823
Case 1:20-cv-01803-AKH   Document 42   Filed 03/16/20   Page 4 of 23

work. Absenteeism poses substantial safety and security risk to both the people inside the facilities and the public.

19. These risks have all been borne out during past epidemics of influenza in jails and prisons. For example, in 2012, the CDC reported an outbreak of influenza in 2 facilities in Maine, resulting in two inmate deaths.[2] Subsequent CDC investigation of 995 inmates and 235 staff members across the 2 facilities discovered insufficient supplies of influenza vaccine and antiviral drugs for treatment of people who were ill and prophylaxis for people who were exposed. During the H1N1-strain flu outbreak in 2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[3] Even facilities on "quarantine" continued to accept new intakes, rendering the quarantine incomplete. These scenarios occurred in the "best case" of influenza, a viral infection for which there was an effective and available vaccine and antiviral medications, unlike COVID-19, for which there is currently neither.

### III.  Profile of COVID-19 as an Infectious Disease[4]

20. The novel coronavirus, officially known as SARS-CoV-2, causes a disease known as COVID-19. The virus is thought to pass from person to person primarily through respiratory droplets (by coughing or sneezing) but may also survive on inanimate surfaces. People seem to be most able to transmit the virus to others when they are sickest but it is possible that people can transmit the virus before they start to show symptoms or for weeks after their symptoms resolve. In China, where COVID-19 originated, the average infected person passed the virus on to 2-3 other people; transmission occurred at a distance of 3-6 feet. Not only is the virus very efficient at being transmitted through droplets, everyone is at risk of infection because our immune systems have never been exposed to or developed protective responses against this virus. A vaccine is currently in development but will likely not be able for another year to the general public. Antiviral medications are currently in testing but not yet FDA-approved, so only available for compassionate use from the manufacturer. People in prison and jail will likely have even less access to these novel health strategies as they become available.

---

[2] *Influenza Outbreaks at Two Correctional Facilities — Maine, March 2011*, Centers for Disease Control and Prevention (2012), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6113a3.htm.
[3] David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deaths-are-few/.
[4] This whole section draws from Brooks J. Global Epidemiology and Prevention of COVID19, COVID-19 Symposium, Conference on Retroviruses and Opportunistic Infections (CROI), virtual (March 10, 2020); *Coronavirus (COVID-19)*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/index.html; Brent Gibson, *COVID-19 (Coronavirus): What You Need to Know in Corrections*, National Commission on Correctional Health Care (February 28, 2020), https://www.ncchc.org/blog/covid-19-coronavirus-what-you-need-to-know-in-corrections.

4

Case 1:15-cr-00229-PAE   Document 138   Filed 03/01/21   Page 57 of 86
Case 3:09-cr-00018-NKM   Document 278-3   Filed 03/24/20   Page 5 of 23   Pageid#: 824
Case 1:20-cv-01803-AKH   Document 42   Filed 03/10/20   Page 5 of 23

21. Most people (80%) who become infected with COVID-19 will develop a mild upper respiratory infection but emerging data from China suggests serious illness occurs in up to 16% of cases, including death.[5]  Serious illness and death is most common among people with underlying chronic health conditions, like heart disease, lung disease, liver disease, and diabetes, and older age.[6]  Death in COVID-19 infection is usually due to pneumonia and sepsis. The emergence of COVID-19 during influenza season means that people are also at risk from serious illness and death due to influenza, especially when they have not received the influenza vaccine or the pneumonia vaccine.

22. The care of people who are infected with COVID-19 depends on how seriously they are ill.[7]  People with mild symptoms may not require hospitalization but may continue to be closely monitored at home.  People with moderate symptoms may require hospitalization for supportive care, including intravenous fluids and supplemental oxygen.  People with severe symptoms may require ventilation and intravenous antibiotics. Public health officials anticipate that hospital settings will likely be overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 becomes more widespread in communities.

23. COVID-19 prevention strategies include containment and mitigation.  Containment requires intensive hand washing practices, decontamination and aggressive cleaning of surfaces, and identifying and isolating people who are ill or who have had contact with people who are ill, including the use of personal protective equipment.  Jails and prisons are totally under-resourced to meet the demand for any of these strategies.  As infectious diseases spread in the community, public health demands mitigation strategies, which involves social distancing and closing other communal spaces (schools, workplaces, etc.) to protect those most vulnerable to disease.  Jails and prisons are unable to adequately provide social distancing or meet mitigation recommendations as described above.

24. The time to act is now.  Data from other settings demonstrate what happens when jails and prisons are unprepared for COVID-19.  News outlets reported that Iran temporarily released 70,000 prisoners when COVID-19 started to sweep its facilities.[8]  To date, few state or federal prison systems have adequate (or any) pandemic preparedness plans in

---

[5] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Centers for Disease Control and Prevention (March 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/summary.html.
[6] *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study.*  The Lancet (published online March 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext
[7] *Coronavirus Disease 2019 (COVID-19): Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, Centers for Disease Control and Prevention (March 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.
[8] *Iran temporarily releases 70,000 prisoners as coronavirus cases surge*, Reuters (March 9, 2020), https://www.reuters.com/article/us-health-coronavirus-iran/iran-temporarily-releases-70000-prisoners-as-coronavirus-cases-surge-idUSKBN20W1E5.

Case 1:15-cr-00229-PAE    Document 138    Filed 03/01/21    Page 58 of 86
Case 3:09-cr-00018-NKM-JCH    Document 276-3    Filed 03/24/21    Page 8 of 36 Pageid#: 825
Case 1:20-cv-01803-AKH    Document 42    Filed 03/16/20    Page 6 of 29

place.[9]  Systems are just beginning to screen and isolate people on entry and perhaps place visitor restrictions, but this is wholly inadequate when staff and vendors can still come to work sick and potentially transmit the virus to others.

## IV.    Risk of COVID-19 in ICE's NYC-Area Detention Facilities

25. I have reviewed the following materials in making my assessment of the danger of COVID-19 in the Bergen, Essex, Hudson, and Orange County jails ("ICE's NYC-area jails"): (1) a declaration by Marinda van Dalen, a Senior Attorney in the Health Justice Program at New York Lawyers for the Public Interest (NYLPI); (2) the report *Detained and Denied: Healthcare Access in Immigration Detention*, released by NYLPI in 2017; and (3) the report *Ailing Justice: New Jersey, Inadequate Healthcare, Indifference, and Indefinite Confinement in Immigration Detention*, released by Human Rights First in 2018.

26. Based on my review of these materials, my experience working on public health in jails and prisons, and my review of the relevant literature, it is my professional judgment that these facilities are dangerously under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak, which would result in severe harm to detained individuals, jail and prison staff, and the broader community. The reasons for this conclusion are detailed as follows.

27. The delays in access to care that already exist in normal circumstances will only become worse during an outbreak, making it especially difficult for the facilities to contain any infections and to treat those who are infected.

28. Failure to provide individuals with continuation of the treatment they were receiving in the community, or even just interruption of treatment, for chronic underlying health conditions will result in increased risk of morbidity and mortality related to these chronic conditions.

29. Failure to provide individuals adequate medical care for their underlying chronic health conditions results in increased risk of COVID-19 infection and increased risk of infection-related morbidity and mortality if they do become infected.

30. People with underlying chronic mental health conditions need adequate access to treatment for these conditions throughout their period of detention.  Failure to provide adequate mental health care, as may happen when health systems in jails and prisons are taxed by COVID-19 outbreaks, may result in poor health outcomes.  Moreover, mental health conditions may be exacerbated by the stress of incarceration during the COVID-19 pandemic, including isolation and lack of visitation.

---

[9] Luke Barr & Christina Carrega, *State prisons prepare for coronavirus but federal prisons not providing significant guidance, sources say*, ABC News (March 11, 2020), https://abcnews.go.com/US/state-prisons-prepare-coronavirus-federal-prisons-providing-significant/story?id=69433690.

Case 1:15-cr-00229-PAE   Document 138   Filed 03/01/21   Page 59 of 86
Case 3:09-cr-00018-NKM   Document 278-3   Filed 03/24/20   Page 7 of 23   Pageid#: 826
Case 1:20-cv-01803-AKH   Document 42   Filed 03/16/20   Page 7 of 29

31. Failure to keep accurate and sufficient medical records will make it more difficult for the facilities to identify vulnerable individuals in order to both monitor their health and protect them from infection. Inadequate screening and testing procedures in facilities increase the widespread COVID-19 transmission.

32. Language barriers will similarly prevent the effective identification of individuals who are particularly vulnerable or may have symptoms of COVID-19. Similarly, the failure to provide necessary aids to individuals who have auditory or visual disabilities could also limit the ability to identify and monitor symptoms of COVID-19.

33. The commonplace neglect of individuals with acute pain and serious health needs under ordinary circumstances is also strongly indicative that the facilities will be ill-equipped to identify, monitor, and treat a COVID-19 epidemic.

34. The failure of these facilities to adequately manage single individuals in need of emergency care is a strong sign that they will be seriously ill-equipped and under-prepared when a number of people will need urgent care simultaneously, as would occur during a COVID-19 epidemic.

35. For individuals in these facilities, the experience of an epidemic and the lack of care while effectively trapped can itself be traumatizing, compounding the trauma of incarceration.

V.   **Conclusion and Recommendations**

36. For the reasons above, it is my professional judgment that individuals placed in ICE's NYC-area jails are at a significantly higher risk of infection with COVID-19 as compared to the population in the community and that they are at a significantly higher risk of harm if they do become infected. These harms include serious illness (pneumonia and sepsis) and even death.

37. Reducing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for those within those facilities and for the community at large.

38. As such, from a public health perspective, it is my strong opinion that individuals who can safely and appropriately remain in the community not be placed in ICE's NYC-area jails at this time. I am also strongly of the opinion that individuals who are already in those facilities should be evaluated for release.

39. This is more important still for individuals with preexisting conditions (e.g., heart disease, chronic lung disease, chronic liver disease, suppressed immune system, diabetes) or who are over the age of 60. They are in even greater danger in these facilities, including a meaningfully higher risk of death.

40. It is my professional opinion that these steps are both necessary and urgent. The horizon of risk for COVID-19 in these facilities is a matter of days, not weeks. Once a case of

Case 1:15-cr-00229-PAE   Document 138   Filed 03/01/21   Page 60 of 86
Case 3:09-cr-00018-NKM   Document 278-3   Filed 03/24/20   Page 9 of 23   Pageid#: 827
Case 1:20-cv-01803-AKH   Document 42   Filed 03/16/20   Page 8 of 23

COVID-19 identified in a facility, it will likely be too late to prevent a widespread outbreak.

41. Health in jails and prisons is community health. Protecting the health of individuals who are detained in and work in these facilities is vital to protecting the health of the wider community.

I declare under penalty of perjury that the foregoing is true and correct.

March 15, 2020
New Haven, Connecticut

Dr. Jaimie Meyer

# Exhibit D

Congress of the United States
Washington, DC 20515

November 9, 2020

Mr. Michael Carvajal
Director
Federal Bureau of Prisons
320 First Street N.W.
Washington, DC 20534

Dear Mr. Carvajal,

We write today to express grave concerns regarding the Bureau of Prison's (BOP's) inadequate protocols for COVID-19 testing and transfers of incarcerated individuals. Specifically, we are concerned that BOP recently transferred COVID-19 positive incarcerated individuals to FCI Fort Dix, which is now facing a second, and potentially severe, COVID-19 outbreak. We strongly urge you to extend the recently enacted moratorium on transferring incarcerated individuals to FCI Fort Dix to also cover FCI Fairton, and that you continue the moratorium until BOP eradicates the new COVID-19 outbreak at the facility and formulates an effective and accurate testing strategy to protect both staff and incarcerated individuals from future outbreaks.

Prior to October, BOP had not reported any recent COVID-19 cases among incarcerated individuals or staff at FCI Fort Dix. However, in early October, BOP reportedly alerted staff at FCI Fort Dix that their facility would begin receiving transfers of incarcerated individuals from FCI Elkton in Ohio. FCI Elkton has been severely affected by COVID-19, with nearly 1,000 known cases among incarcerated individuals and staff to date.[1] Despite the known risks of transferring incarcerated individuals during a pandemic,[2] BOP transferred more than 150 incarcerated individuals from FCI Elkton to FCI Fort Dix in recent weeks. On October 28, 2020, BOP confirmed in an email to congressional staff that 54 incarcerated individuals tested positive for COVID-19 in the 5812 unit of FCI Fort Dix, which is reportedly the unit into which the individuals from FCI Elkton were transferred. On October 29, 2020, BOP confirmed that five incarcerated individuals from FCI Elkton who were transferred to FCI Fort Dix on the evening of October 28, 2020 had rapid-tested positive for COVID-19 upon arrival and were placed in isolation.

While the situation is rapidly evolving, it is clear that BOP does not have an effective plan to ensure COVID-19 positive incarcerated individuals are not transferred between facilities. The outbreak is now spreading within FCI Fort Dix, and as of November 9, 2020, there are at least 228 active COVID-19 cases among incarcerated individuals and ten active COVID-19 cases among staff members.[3] The FCI Fort Dix employees responsible for transporting the FCI Fort Elkton transfers may have been exposed to COVID-19 in transit. All incarcerated individuals and

---

[1] https://www.bop.gov/coronavirus/
[2] https://www.bop.gov/coronavirus/covid19_status.jsp
[3] https://www.bop.gov/coronavirus/

staff at FCI Fort Dix and the surrounding communities are now at increased risk for contracting COVID-19, with potentially deadly consequences.

In light of the rapidly escalating crisis at FCI Fort Dix, we urge you to immediately test all FCI Fort Dix incarcerated individuals and staff for COVID-19. We appreciate that BOP has instituted a temporary moratorium on transfers into FCI Fort Dix until November 23, 2020. However, rather than using an arbitrary date, we urge BOP to halt all transfers to FCI Fort Dix until BOP institutes an effective and accurate testing strategy for incarcerated individuals and staff and there are no active cases at the facility. Given that BOP does not currently have an effective strategy for safely transferring incarcerated individuals, we also request that BOP extend this moratorium to New Jersey's other facility, FCI Fairton.

In regards to an effective COVID-19 testing strategy, we strongly urge you to institute a plan to test all FCI Fort Dix incarcerated individuals and staff on at least a biweekly basis. FCI Fort Dix's employees are frontline federal workers, and it is unacceptable that BOP is not providing them with regular COVID-19 testing. By failing to test FCI Fort Dix's employees, BOP is needlessly endangering not only these employees but their families, all incarcerated individuals, and the entire surrounding community.

Additionally, we request that BOP provide detailed answers to the following questions no later than Friday, November 20, 2020:

1) Will BOP commit to halting all transfers of incarcerated individuals to FCI Fort Dix and FCI Fairton until the current COVID-19 outbreak at the facility has ended and there are no active cases among incarcerated individuals or staff?

2) During the FCI Fort Dix transfer moratorium, will BOP also commit to halting any transfers of incarcerated individuals to FCI Fairton?

3) What is BOP's plan for addressing the current COVID-19 outbreak at FCI Fort Dix, including information on testing, safety protocols, notifications to staff and incarcerated individuals, as well as any future outbreaks at FCI Fort Dix and ensuring the safety of both incarcerated individuals and staff?

4) In an email to congressional staff, BOP indicated that incarcerated individuals who had tested positive for COVID-19 in the previous 90 days and were asymptomatic were not retested before being transferred from FCI Elkton to FCI Fort Dix. Can you verify that all FCI Elkton incarcerated individuals who previously tested positive for COVID-19 received two negative COVID-19 test results before their transfer to FCI Fort Dix? Please describe, in detail, the process for testing the FCI Elkton incarcerated individuals prior to their transfer to FCI Fort Dix.

5) What is BOP's overall, long-term COVID-19 testing strategy for FCI Fort Dix? How will BOP update the COVID-19 testing strategy at FCI Fort Dix in light of the recent outbreak?

6) Will BOP begin providing COVID-19 testing to FCI Fort Dix employees? If so, how often will such testing occur?

7) How has FCI Fort Dix spent the CARES Act (P.L. 116-136) funding that has been allocated the facility? Please provide a detailed breakdown.

Thank you for your prompt consideration of this urgent matter.

Sincerely,

Robert Menendez
United States Senator

Cory A. Booker
United States Senator

Frank Pallone, Jr.
Member of Congress

Bill Pascrell, Jr.
Member of Congress

Albio Sires
Member of Congress

Donald M. Payne, Jr.
Member of Congress

Donald Norcross
Member of Congress

Bonnie Watson Coleman
Member of Congress

Josh Gottheimer
Member of Congress

Mikie Sherrill
Member of Congress

Andy Kim
Member of Congress

Tom Malinowski
Member of Congress

# Exhibit E



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | |
|---|---|---|
| *Lindsey McCulley*<br>*Assistant United States Attorney*<br>*Lindsey.McCulley@usdoj.gov* | *Suite 400*<br>*36 S. Charles Street*<br>*Baltimore, MD 21201-3119* | *DIRECT: 410-209-4948*<br>*MAIN: 410-209-4800*<br>*FAX: 410-962-0717* |

May 18, 2020

The Honorable Ellen L. Hollander
United States District Judge
United States Courthouse
101 W. Lombard Street
Baltimore, Maryland 21201

Re:     Amendment to Government's Response to Motion for Compassionate Release in
        *United States v. Marvin Wise*
        Crim. No. ELH-18-072

Dear Judge Hollander:

The Government writes to **amend** its Response to the Defendant's Motion for
Compassionate Release and Sentence Modification.  ECF 180.  Since filing its response on May
11, 2020, undersigned counsel has been informed that the Department of Justice ("DOJ") has
taken the position that inmates who suffer from a condition identified by the Center for Disease
Control and Prevention ("CDC") as putting them at higher risk for severe illness from COVID-
19 and who are not expected to recover from that condition, present an "extraordinary and
compelling reason" to be considered for compassionate release—even if that condition in
ordinary times would not meet the terms of the policy statement. *See* U.S.S.G. § 1B1.13 cmt. n.
1(A)(ii)(I).

These CDC risk factors include:
- People 65 years and older;
- People who live in a nursing home or long-term care facility'
- People of all ages with underlying medical conditions, particularly if not well
  controlled, including:
  - People with chronic lung disease or moderate to severe asthma
  - People who have serious heart conditions
  - People who are immunocompromised
    - Many conditions can cause a person to be immunocompromised,
      including cancer treatment, smoking, bone marrow or organ
      transplantation, immune deficiencies, poorly controlled HIV or
      AIDS, and prolonged use of corticosteroids and other immune
      weakening medications
  - People with severe obesity (body mass index [BMI] of 40 or higher)
  - People with diabetes

- People with chronic kidney disease undergoing dialysis
- People with liver disease

Centers for Disease Control, "People Who Are at Higher Risk for Severe Illness," available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html, accessed May 18, 2020.

The Defendant's medical records indicate that he suffers from asthma. The CDC notes that "[p]eople with moderate to severe asthma may be at higher risk of getting very sick from COVID-19. COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease." The Defendant's medical records do not indicate whether his asthma is mild, moderate, or severe, but do indicate the Defendant has never required a controller medication or been hospitalized for asthma, and that his asthma worsens with colds but not exercise. The Defendant also suffers from kidney disease, and had a kidney removed after previously suffering from cancer, but he does not require dialysis. The CDC does not explain further whether this would make the Defendant immunocompromised. The Defendant has had heart attacks in the past but the records do not reflect whether that would mean he suffers from a "serious heart condition." Regardless, he does suffer from Type II diabetes, which is clearly identified as a risk factor by the CDC. Thus, consistent with current DOJ policy, the Government does not contest the Defendant's eligibility for being considered for compassionate release in this case because he suffers from a condition identified by the CDC as putting him at higher risk for severe illness. *See* U.S.S.G. § 1B1.13 cmt. n. 1(A)(ii)(I).

Even though the Government considers the Defendant eligible for consideration of compassionate release, the Government still maintains that the Defendant should not be granted compassionate release for all the other reasons outlined in its response. The Government's review of cases where compassionate release was granted or denied appropriately demonstrate that the Defendant is not a good candidate for compassionate release. As fully outlined in the Government's response, the Defendant has served very little of his sentence, the Bureau of Prisons and FCI-Allenwood have taken steps to minimize the COVID-19 risks and to effectuate any necessary treatment in that facility, and the 18 U.S.C. §3553 factors were appropriately considered by this Court just 10 months ago and do not militate in favor of a sentence less than what the Court already ordered. The Government respectfully continues to request that the Court deny the Defendant's Motion for Compassionate Release.

Very truly yours,

Robert K. Hur
United States Attorney

_____/s/_____
Lindsey McCulley
Assistant United States Attorney

via CM/ECF: counsel of record

2

# Exhibit F

Before completing this sheet, please review Program Statement 5050.50, Compassionate Release/Reduction In Sentence, available in the law library.

## COMPASSIONATE RELEASE/REDUCTION IN SENTENCE

NAME: _Thomas Hocy_ UNIT: _5702_ REG#: _92147-054_ DATE: _12/8/2020_

Who is your Physician (circle): Patel    (Scusa)    Sood    Chinwalla    UNKNOWN

**Choose One Criteria: You can only apply under one criteria.**

Extraordinary/Compelling Circumstances:

____**Medical Circumstances**

    ____Terminal Medical Condition- Terminal Diagnosis with 18 months or less life expectancy.

    ____Debilitated Medical Condition – Illness that has you partially (50%) or completely (100%) disabled.

____**Elderly Inmates**    _Sleep Apnea, Elevated Blood Pressure_

    ____"New Law" Elderly Inmates – 70 years old or older, and served 30 years or more of sentence.

    ____Elderly with Medical Conditions – 65 years old or older and served at least 50% of sentence.

    ____Other Elderly Inmate- 65 years or older and served at least 75% of sentence or the greater of 10 years.

____**Death or Incapacitation of the Family Member Caregiver of an inmate's dependent child**- provide verifiable documentation the child is "suddenly" without a caretaker, the family member is in an incapacitated state and unable to care for the child.

____**Incapacitation of a Spouse or Partner** – provide verifiable medical documentation of incapacitated state.

**To be completed by inmate:**

Briefly describe your medical condition or non-medical circumstance:

_I have been diagnosed with Sleep Apnea by Pulmonary Dr. medical Staff Here has Noticed elevated Blood Pressure._

If you have applied before, has anything changed in your medical condition since your last application (if so, describe):

_____

**Proposed Release Plan (Must have ALL of the following):**

Name and contact information of who you will live with, and the last time you spoke to this person about your release plan:

_My Apartment for 25years, my Dad or Wife will pick me up._

Address of where you will be living: _780 W. Broadway Long Beach, NY 11563_

Where will you receive medical treatment (if applicable): _Dr. David Kim, Wantagh/Lynbrook NY_

How will you pay for your medical treatment (if applicable): _Company medical Plan_

Additional Comments:

_____
_____

Updated 6/30/2020

# Exhibit G

315

**Hoey, Thomas**
Register Number: 92147-054
Unit: 5702 (A)

## INMATE REQUEST TO STAFF RESPONSE

This is in response to your request for consideration for
Compassionate Release/Reduction in Sentence (RIS) in accordance with
18 U.S.C. §3582(c)(1)(A) and Program Statement 5050.50, Compassionate
Release/Reduction in Sentence, Procedures for Implementation, 18 U.S.C.
§3582(c)(1)(A) and §4205(g).

In accordance with Program Statement 5050.50, Compassionate
Release/Reduction in Sentence, Procedures for Implementation, 18 U.S.C.
§3582(c)(1)(A) and §4205(g), an inmate may initiate a request for
consideration only when there are particularly extraordinary or
compelling circumstances which could not reasonably have been foreseen
by the court at the time of sentencing.

Title 18 of the United States Code, section §3582(c)(1)(A), allows a
sentencing court, on motion of the Director of the BOP, to reduce a
term of imprisonment for extraordinary or compelling reasons. The BOP
has interpreted the extraordinary and compelling circumstances in a
number of categories outlined in policy. BOP Program Statement No.
5050.50, Compassionate Release/Reduction in Sentence: Procedures for
Implementation of 18 U.S.C. §3582(c)(1)(A) and §4205(g), provides
guidance on the types of circumstances that present extraordinary or
compelling reasons, such as the inmate's terminal medical condition;
debilitated medical condition; status as a "new law" elderly inmate,
an elderly inmate with medical conditions, or an "other elderly
inmate"; the death or incapacitation of the family member caregiver of
the inmate's child; or the incapacitation of the inmate's spouse or
registered partner.

If you still wish to be considered for Compassionate Release/RIS,
please re-submit your request with the one specific category, along
with a detailed release plan (medical, employment, financial).


_____                    ___12-11-2020___
R. Robinson                                 Date
R.I.S. Coordinator

# Exhibit H

Dear Judge Engelmayer,

I pray that you Grant my compassionate release. I have lived in fear of contracting Covid-19, and ultimately became very sick and tested positive. The simple reality of prison over-crowding and impossible ability to "social distance" from other inmates, makes prison a breeding ground for this virus. I still have lasting effects of the virus, and very much need to be released so that I can go to see my Doctor. The BOP is currently overwhelmed with infection, and the medical staff cannot protect me, and give me the care I now need. I have not received incident reports for bad behaviour. And so now I have been designated "Out-custody".(See attached "Male Custody Classification Form") This means that I eligible to work in the community. The BOP has classified me as the lowest risk an inmate can receive here. Judge, this is significant, because when I came to prison, I was classified level 21. Now, I am a level 5. This is a major accomplishment around here. I did take my rehabilitation seriously, and now I can finally demonstrate to this Honorable Court that the BOP thinks so also. I do understand the serious nature of my crimes, however, I plead with You to consider my motion for the man I am today. I have a loving family, and have not had a family visit in 11 months. I am on constant lock-down, due to the outbreak of the virus. I do hope that you recognize this is additional pushishment and harsh conditions that were not anticipated by this Court previously. I have a good release plan. I will live with My Dad at 780 West Broadway, Long Beach, New York. I will see Dr. David Kin, my primary care Dr, and I have medical coverage from the family real estate company.

Your Honor, I will be a model citizen, as I have been all these years here in the prison community. I am grateful that I survived my sickness from Corona-Virus. A fellow inmate here, Myron Crosby died here last week, he was only 58 years old.(See attached article about Myron's death) I live in fear Your Honor, of being re-infected and losing my life. I was not sentenced to death, but I now live in constant fear of that reality. I hope this once in a 100-year Pandemic and my suffering is enough for you to grant my release. Respectfully Submitted,

Thomas Hoey

```
   FTDQT  606.00 *      MALE CUSTODY CLASSIFICATION FORM      *      01-26-2021
 PAGE 001 OF 001                                                     15:19:31
                           (A) IDENTIFYING DATA
 REG NO..: 92147-054            FORM DATE: 12-02-2020         ORG: FTD
 NAME....: HOEY, THOMAS JR
                                       MGTV: NONE
 PUB SFTY: NONE                        MVED:
                            (B) BASE SCORING
 DETAINER: (0) NONE             SEVERITY.......: (3) MODERATE
 MOS REL.: 36                   CRIM HIST SCORE: (04) 6 POINTS
 ESCAPES.: (0) NONE             VIOLENCE.......: (0) NONE
 VOL SURR: (0) N/A              AGE CATEGORY...: (2) 36 THROUGH 54
 EDUC LEV: (0) VERFD HS DEGREE/GED  DRUG/ALC ABUSE.: (0) NEVER/>5 YEARS
                            (C) CUSTODY SCORING
 TIME SERVED.....: (4) 26-75%   PROG PARTICIPAT: (2) GOOD
 LIVING SKILLS...: (2) GOOD     TYPE DISCIP RPT: (5) NONE
 FREQ DISCIP RPT.: (3) NONE     FAMILY/COMMUN..: (4) GOOD


                    --- LEVEL AND CUSTODY SUMMARY ---
 BASE CUST VARIANCE   SEC TOTAL   SCORED LEV MGMT SEC LEVEL   CUSTODY  CONSIDER
 +9   +20    -4         +5        MINIMUM      N/A              OUT    DECREASE


 G5149      INMATE/DESIG FACL LEVEL MISMATCHED, HAVE DSCC ADD A MGTV
 G0005      TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

# Burlington County Times

NEWS

# FCI Fort Dix sees first inmate death due to COVID, officials report

**George Woolston** Burlington County Times

Published 4:53 p.m. ET Jan. 25, 2021 | Updated 5:00 p.m. ET Jan. 25, 2021

JOINT BASE McGUIRE-DIX-LAKEHURST — Federal officials reported the first death of an inmate at FCI Fort Dix due to COVID-19.

Myron Crosby, 58, died Friday due to complications from the virus, the U.S. Bureau of Prisons (BOP) announced.

Crosby, who suffered from pre-existing conditions that made him more vulnerable to the virus, tested positive for COVID-19 on Dec. 28 and was placed into isolation, according to the BOP.

After he experienced difficulty breathing, Crosby was transported to a local hospital for treatment on Jan. 7, the BOP said. He remained at the hospital until his death.

As of Monday, there were 40 active COVID cases among inmates at the prison, and 32 active cases among staff.

A total of 1,409 inmates and 45 staff members have recovered from the virus, according to BOP data. The federal prison currently houses 2,729 inmates.

Crosby, of Massachusetts, was sentenced to 168 months in federal prison for trafficking heroin to Maine in 2019. He was serving his sentence at FCI Fort Dix.

In April, Crosby had filed a petition for compassionate release from the prison due to the COVID-19 pandemic and being severely obese and diagnosed with stage 4 kidney disease, Type 2 diabetes, as well as having heart problems — all conditions that make one more vulnerable to COVID-19.

"The bottom line is that Mr. Crosby's health problems put him at increased risk of dying if he contracts the virus, and his continued incarceration at FCI Fort Dix makes it much

more likely he will be infected," Crosby's attorney, Jeffrey Silverstein, wrote in his client's emergency motion filed on April 21.

His petition was denied in U.S. District Court in Maine on Oct. 27, around the same time the low-security federal prison on Joint Base McGuire-Dix-Lakehurst was experiencing its first outbreak of COVID-19.

**Fort Dix:** 'Clear and present danger': U.S. Rep. Kim calls for FCI Fort Dix lockdown as cases top 800

**Fort Dix:** FCI Fort Dix sees 2nd COVID outbreak as active cases top 450

The spread of the virus inside the prison in late October and November, and again at the end of December where active cases inside the prison reached over 800 earlier this month, has been criticized heavily by lawmakers, activists, and inmates' family members.

After repeated letters to BOP and FCI Fort Dix Warden David Ortiz demanding answers for how the virus spread inside the prison and what BOP did to contain it, on Jan. 15 members of New Jersey's Congressional delegation led by U.S. Senators Bob Menendez and Cory Booker and Congressman Andy Kim called for the Department of Justice Inspector General to expand his ongoing investigation into the BOP's COVID-19 response to include its handling of an outbreak at FCI Fort Dix.

Earlier this month, Menendez and Booker called for Warden Ortiz to grant home confinement to as many eligible inmates as possible, and Kim called for the prison to be put on lockdown, calling the outbreak "a clear and present danger."

BOP officials insist CDC protocols inside the prison are followed, and the spike of active COVID cases among inmates inside the prison is in part due to an increase in testing.

A BOP spokesperson earlier this month said most inmates who test positive at FCI Fort Dix are asymptomatic.

"The BOP is fortunate to have the requisite testing resources to engage in mass testing which will, of course, result in higher numbers of positive cases," BOP spokesman Justin Long said in an email on Jan. 12. "Just as local communities nationwide see substantially increased positives when they begin to engage in mass testing, the number of positive cases reported in prison rises with increased testing."

Crosby is the second federal inmate to die of COVID-19 in New Jersey.

Fred Keys, 57, an inmate at FCI Fairton in Cumberland County, died of complications from COVID-19 earlier this month, according to the BOP.

Keys, who also suffered from pre-existing conditions and had been treated for congestive heart failure a month earlier, died on Jan. 9 after being diagnosed with COVID-19 on Dec. 15.

He was serving a 360-month sentence for racketeering conspiracy and conspiracy to possess with intent to distribute and had been at FCI Fairton since 2017.

FCI Fairton is a medium security facility that currently houses 889 male offenders.

There have been a total of 1,827 cases of COVID-19 inside FCI Fort Dix and FCI Fairton since March.

As of Monday, there are 14 active cases among inmates and 27 active cases among staff at FCI Fairton.

A total of 271 inmates and 17 staff members at FCI Fairton have recovered from the virus, according to BOP data.

*George Woolston is a South Jersey native who covers several topics for the Burlington County Times. He joined the staff in 2019. Contact him at gwoolston@thebct.com and follow on Twitter @gcwoolston. Help support local journalism with a subscription to the Burlington County Times.*

CERTIFICATE OF SERVICE

I, Thomas Hoey, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that on this 8th day of February, 2021, I placed a true and accurate copy of the foregoing "EMERGENCY COVID-19 FILING" in the institutional mailbox to the following party:

U.S. Attorney's Office (SDNY)
One St. Andrew's Plaza
New York, NY 10007

Respectfully Submitted,

Thomas Hoey
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,          :
                                   :
                                   :
v.                                 :
                                   :   DOCKET NO. 15-cr-229 (PAE)
THOMAS HOEY,                       :
                    Defendant.     :

DEFENDANT'S SUPPLEMENT TO MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

THOMAS HOEY must update information contained in his
original motion for compassionate release as new COVID-19
variants are rapidly emerging across the United States and the
Bureau of Prisons ("BOP") has utterly failed to protect inmates
from COVID-19, and now from the accelerated spread of several new
coronavirus variants that appear to be deadlier and re-infecting
people previously sickened with COVID-19, and are resistant to
vaccine protection.

A.    New COVID-19 Variants Are Emerging Across the United
      States Raises Alarm

As the United States sees a continuing steep drop in the
COVID-19 cases, health officials expressed growing concern about
the accelerated spread of new coronavirus variants and their
resistance to vaccines's protection. Maryland and South Carolina
report five cases of the South African variant, or B.1.351, which
overwhelmed South Africa and spread to at least 32 countries –

- 1 -

and appears to be re-infecting people previously sickened with COVID-19. The B.1.1.7 strain, or U.K. variant - which spreads up to 70 percent more easily than earlier strains and may be 30 percent more lethal - has been detected in New Jersey and 29 other states. The first death from the U.K. strain was announced by New Jersey State Health Commissioner Judy Pereira, "New Jersey Reports First Known U.S. Death From U.K. Variant," The Gothamist, Jan. 27, 2021, at https://www.google.com/amp/s/champ.gothamist.com/champ/gothamist/news/new-jersey-reports-first-known-us-death-UK-variant).

A case of the P.1 strain that devastated the Brazilian city of Manaus was reported in Minnesota, and as this coronavirus variant begins to spread across the country, one of the nation's top infectious disease experts said on 'Meet the Press,' Dr. Michael Osterholm, the director of the Center for Infectious Disease Research and Policy at the University of Minnesota, warned that these variants could cause a "category 5" hurricane of new cases in about six weeks. "We are going to see something like we have not seen in this country," Osterholm said (see Carolyn Crist, "'Category 5' COVID Hurricane Approaches Experts Say," WebMD, Dec. 1, 2021, at https://www.webmd.com/uny/news/20210201/category-5-covid-hurricane-approaches-experts-say).

The warnings came at the same time vaccines have brought hope for an end to the pandemic. Johnson & Johnson unveiled trial data showing its single-dose vaccine is 66 percent effective in preventing illness and 100 percent effective in preventing

hospitalizations and death. Noravax released preliminary results showing nearly 90 percent effectiveness in a British trial. But both vaccines showed somewhat reduced effectiveness against the South African variant, as did Pfizer and Moderna's vaccines, "The implications are really worrisome," said Peter Hotez, the dean of the National School of Tropical Medicine at Baylor College of Medicine (see Robert Langreth, "COVID-19 Mutations Undercut Optimism Even as Vaccines Near," The Japan Times, Jan. 31, 2021, at: https://www.japantimes.co.jp/news/2021/01/31/world/ coronavirus-variants-vaccine-fears).

The emergence of variants marks the start of "a new phase in the battle against the SARS-CoV-2 virus," said Matthew Heper in StatNews (See "A New Phase in the Battle Against the SARS-CoV-2 Virus," Statnews, Jan. 29, 2021, at: https://www.statnews.com/ 2021/01/29/jj-one-dose-covid-vaccine-is-66-effective-a-weapon-but-not-a-knockout-punch). It "raises the possibility that vaccine makers will have to develop booster shots to protect against it" - which Pfizer, Moderna, and Johnson & Johnson are already at work on. "This is a fight that could go on for a long time," said Robert Langreth in Bloomsberg.com. Vaccines that are effective now "may fade in the future unless strong booster shots are devised" to combat new mutations. In the long run, COVID-19 may morph into "something akin to influenza, requiring periodic booster shots" to keep it at bay. There are more dire scenarios, thought. Asked what kept him up at night, Dr. Anthony Fauci, the nations top infectious disease expert, responded, "A mutation where it really escapes everything (Id.).

Brazil's massive outbreak from a new strain raises the possibility that coronavirus "might be outracing our efforts in containing it, said David Wallace-Wells in NYmag (see "Brazil's New COVID Strain Raises Big and Scary Questions"). It will take up to three years to vaccinate a majority of people in the developing world, and as the virus continues to spread and replicate, more mutations will arise. The worst case scenario is that Dr. Fauci's worst nightmare may emerge where the virus will achieve "immune escape" - meaning that antibodies from previous Covid cases and vaccines no longer work.

B.      **The BOP is Failing to Protect Inmates From COVID-19 in Violation of the Due Process Clause**

When the BOP takes a person into custody against that person's will, the Constitution imposes upon the BOP a duty to assume responsibility for that inmate's safety and general well being. See Helling v. McKinney, 509 U.S. 25, 32 (1993). Under the Eighth Amendment, the BOP must provide inmates with basic human needs, including reasonable safety. Helling, 509 U.S. at 32. The BOP violate the Eighth Amendment if it confines inmates in unsafe conditions. See Helling, 509 U.S. at 33. Moreover, the BOP may not "ignore a condition of confinement that is sure or very likely to cause serious illness." Helling, 509 U.S. at 32.

The law is clear, the BOP cannot put an inmate into a dangerous situation, especially where that dangerous situation was created by the BOP, and exposing an individual to a danger

which he would not have otherwise faced (see <u>DeShaney v.</u> <u>Winnebago County Dep't of Social Servs.</u>, 489 U.S. 189, 201 (1989)). Thus, an inmates constitutional rights are violated if a condition of his confinement places him at substantial risk of suffering serious harm, such as harm caused by a pandemic.

Here, defendant argues that the conditions at FCI Fort Dix exposed him to a substantial risk of suffering serious harm – increasing his exposure to contracting COVID-19. When the BOP fails to provide for an inmate's basic human needs, including medical care and reasonable safety, the Due Process Clause is violated. <u>DeShaney v. Winnebago Cty Dep't of Soc. Servs.</u>, 489 U.S. 199, 200 (1985).

Moreover, defendant is facing a looming threat from the more infectious new coronavirus variants, and until "we" achieve mass vaccinations, better masks could be the key to slowing the pandemic and limiting spread. Early in the pandemic, health officials, including Dr. Fauci said that any cloth mask will do. But science has continued to emerge that a typical cloth mask captures, at best, only half the aerosols we emit or are exposed to from other people. Surgical masks are a big improvement, blocking 70 or 80 percent, but these masks are considered contraband for inmates to possess. Instead, all inmates at FCI Fort Dix are only given three one-layer cloth masks, while there is no reason why all inmates should not be given the gold standard: N95 masks that achieve 95 percent filtration with multiple layers and an electrostatic charge that captures tiny,

- 5 -

virus-carrying droplets. All the experts, including Dr. Fauci, said this could be a game changer.

Hereto attached as Exhibit "A" is the cloth mask that all inmates are issued at FCI Fort Dix and mandated to use at all times outside of their rooms. These masks are useless and afford no protection, but this is the BOP's answer to what stands between Mr. Hoey and any of the new variants that are highly contageous and possibly more deadly. It is only a matter of time until any of these new variants penetrate into FCI Fort Dix when it was apparent that the BOP was unable to prevent this second outbreak of COVID-19 that infected over 1,500 inmates and dozens of staff and killed 2 inmates so far.

According to Commissioner Periera, the U.K., or B.1.1.7 strain is already becoming the dominant strain in New Jersey, so it is only a matter of time until it begins to infect FCI Fort Dix, with the possibility that it might already be here as new Covid cases emerge each day at this prison.

Submitted on this 15th day of February 2021

Thomas Hoey
Defendant, Pro Se
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

CERTIFICATE OF SERVICE


I, Thomas Hoey, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that on this 15th day of February, 2021, I placed a true and accurate copy of the foregoing "DEFENDANT'S SUPPLEMENT TO MOTION FOR COMPASSIONATE RELEASE" in the institutional mailbox to the following party:


AUSA
U.S. Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007


Respectfully Submitted,


Thomas Hoey
Reg. No. 92147-054
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640


- 7 -



# EXHIBIT A